IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 6, 2013

IN RE T. F.H. ET AL.

Appeal from the Juvenile Court for Hamblen County
No. 16898     Mindy Norton Seals, Judge

No. E2013-01147-COA-R3-PT-FILED-FEBRUARY 28, 2014

A.F.C. ("Father") appeals the order terminating his rights to his minor children, T.F.H. and
P.F.H. ("the Children").  After a bench trial, the court found, by clear and convincing
evidence, that multiple grounds exist to terminate Father's parental rights.  The court further
found, also by clear and convincing evidence,  that termination is in the best interest of the
Children.  Father appeals.  He challenges the finding of grounds for termination, but not the
best-interest determination.  We affirm the judgment in all respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL
SWINEY and JOHN W. MCCLARTY, JJ., joined.

Gerald T. Eidson, Rogersville, Tennessee, for the appellant, A.F.C.

Robert E. Cooper, Jr., Attorney General and Reporter; Alexander S. Rieger, Assistant
Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of
Children's Services.

**OPINION**

I.

Father and L.H.R. ("Mother"), a married couple, are the Children's parents.  On
November 21, 2010, Mother was killed in a one-car accident in North Carolina.  Father was
driving the vehicle; the Children were also passengers.  The death certificate reflects that
Mother was thrown out of the vehicle when it overturned and died from traumatic chest and

neck injuries. In connection with the accident, Father was charged with various felonies and other offenses. Father subsequently moved with the Children from North Carolina to Tennessee.

In the Fall of 2011, the Department of Children's Services ("DCS") became involved with the family after receiving a referral that T.F.H. was being medically neglected. School officials reported that the child repeatedly came to school without medication or testing supplies to treat and monitor her severe Type 2 diabetes. Calls by DCS staff to the social services department in North Carolina revealed a history of medical neglect of the child in that state and "Father's unwillingness to take the child to treatment and/or follow-up appointments." DCS also received information that, in North Carolina, Mother and Father had two other minor children that were removed from their custody at one point after "passing out a lot," and those Children passed away in 2009.[1] In September 2011, a Child Protective Services ("CPS") investigator interviewed Father. Portions of the interview were read into the record at trial. By this time, Father was in a relationship with S.E. ("Girlfriend") and the two planned to marry. Regarding his work history, Father reported that he was employed at different locations packing toothbrushes. He worked from 12 p.m. until 11 p.m. Girlfriend cared for the Children while he worked. He was looking for "a more stable job." He told the investigator that he was scheduled to go to court later that month over a "little accident" he had in which Mother died.

On November 1, 2011, the Children were removed to DCS protective custody. DCS alleged that the Children were dependent and neglected in Father's care based on medical neglect of T.F.H. In addition, the petition noted that both children were suffering depression from the loss of their mother but had received no therapy. Finally, DCS noted Father was facing criminal charges in North Carolina and could incur substantial jail time and possible extradition if convicted. The Children were placed in a foster home when no relatives could be located to assume custody. They were adjudicated dependent and neglected in July 2012.

On December 1, 2011, Father was jailed in Hamblen County for failure to appear on charges stemming from the car accident. He waived a hearing and was extradited to North Carolina to stand trial. He was released later that month pending trial. While incarcerated, Father participated with DCS in developing a family permanency plan. Generally stat4ed, the plan required that Father obtain an alcohol and drug assessment and a mental health assessment; notify DCS of any possible relative placements for the Children; obtain a stable income and housing; participate in family therapy as necessary; and resolve all criminal issues. The initial plan was revised six months later, but generally included the same steps, none of which were completed. Father signed the permanency plan and the criteria for

---

[1]The cause of those children's death is not noted in the record before us.

termination of parental rights documents to acknowledge his awareness of the grounds for termination. Father, who understands and speaks little English, was assisted throughout the case by interpreters.

In January 2012, Father was permitted by a North Carolina court to return to Tennessee to get his affairs in order. DCS arranged a 2-hour visit with the Children on January 5 from 5:00 to 7:00 p.m. However, "at 5:50, he was ready to leave and he said his goodbyes." Pending trial, Father spoke with the Children by telephone a few times, but did not have further visits. The DCS family services worker, Heidi Huenergarde, made efforts to arrange a meeting between Father and the Children at the North Carolina state border, but Father did not return her call to finalize the arrangements. Father returned to Tennessee and attended a "Child and Family" team meeting at DCS in May 2012. Both Father and Girlfriend attended meetings at DCS to develop and revise the Children's permanency plan. Ms. Huenergarde, through an interpretor, reviewed the plan from beginning to end with them with the exception of the section discussing the reasons the Children came into custody. The written criteria for termination of parental rights was provided to Father in Spanish.

On June 26, 2012, Father pleaded guilty to felony death by vehicle and was sentenced to 19 to 32 months in prison. Pursuant to his plea agreement, other charges including driving while intoxicated, reckless driving, violation of the open container law, and other offenses were dismissed. He immediately began serving his sentence.

On August 9, 2012, DCS filed a petition to terminate Father's parental rights. A bench trial took place over two dates in February and March of 2013. Father, who remained in prison in North Carolina, was represented by counsel and personally participated by telephone. Two translators assisted him.

At the time of trial, the Children had remained in their same pre-adoptive foster home for some fifteen months. T.F.H. was 14 and P.F.H. was 10. In foster care, the Children received therapy twice a month to help them deal with Mother's death. Both had individual education plans they followed at school and both were receiving regular medical and dental care. T.F.H. was under the care of an endocrinologist and her diabetes was under control. She administered regular insulin injections herself and had started to manage her diet with foster mother's help. Foster parents were well-educated with respect to managing diabetes as foster father was also a diabetic. P.F.H. has shown great improvement in his school performance. The Children were described as being "very happy" and "safe" in their foster home. They had developed a bond with their foster parents and the other children in the home.

The Children's therapist noted that T.F.H. was having more difficulty than her brother dealing with the loss of two siblings,[2] then Mother, and then being removed to foster care, all in a brief span of time. T.F.H. recalled the car wreck in detail. According to the therapist, T.F.H. remained angry with Father and blamed him for Mother's death – "She would say, '[Father] was on a substance, he was drinking, and caused a wreck.' " P.F.H., on the other hand, would disagree with his sister and say, "No. [Father] just went to sleep." T.F.H. was concerned with the outcome of the termination case and had no desire to live with Father.

In his defense, Father testified to the accident that claimed Mother's life. He conceded that he was drinking the previous night, smelled of alcohol, and had a half-finished container of beer in the car, but insisted that he was not intoxicated when he crashed. He claimed he was not guilty, but entered a plea to "felony death by vehicle"on his attorney's advice. Father acknowledged he had drank alcoholic beverages for over twenty years. In 1998, he was arrested for drunk driving. Father claimed that since then, he drank "once a month or once every two weeks" in his parked car until he was intoxicated. He then came into the house and went to bed. He conceded the Children had seen him intoxicated. According to Father, he had "stopped cold" drinking alcoholic beverages after the accident and had joined alcoholics anonymous in prison.

Father anticipated being released from prison by January 1, 2014. He was unaware whether he would be held for exportation afterwards. He could not recall the last time he had seen the Children. Father expressed his love for the Children and his desire to be reunited as a family.

After the trial, the court terminated Father's parental rights. At the outset, the court found that the grounds of substantial noncompliance with a permanency plan and persistence of conditions were not proven because DCS failed to use reasonable efforts to assist Father in achieving reunification. Additionally, a ground based on a parent's liability for the wrongful death of the other parent was dismissed. Of the remaining alleged grounds, the trial court found that abandonment by wanton disregard, abandonment by non-support, and severe child abuse were clearly and convincingly proven. Further, the court found clear and convincing evidence that termination was in the best interest of the Children. Father timely filed a notice of appeal.

II.

Father raises issues for our review that we have restated slightly as follows:

---

[2]The DCS case record contains an entry that "[F]ather reported to [Child Protective Services] that . . . he has had two other children to die and that DSS in North Carolina removed them from his care."

1. Whether the trial court erred in finding that Father showed a wanton disregard for the welfare of the Children as a ground for termination.

2. Whether the trial court erred in finding that Father committed severe child abuse as a ground for termination.

3. Whether the trial court erred in finding that Father abandoned the Children by failing to pay child support as a ground for termination.

III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to the care, custody, and control of their children. While parental rights are superior to the claims of other persons and the government, they are not absolute, and they may be terminated upon appropriate statutory grounds. A parent's rights may be terminated only upon "(1) [a] finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and (2) [t]hat termination of the parent's or guardian's rights is in the best interest[] of the child." Both of these elements must be established by clear and convincing evidence. Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.

*In re Angelica S.*, E2011-00517-COA-R3-PT, 2011 WL 4553233 at *11-12 (Tenn. Ct. App. E.S., filed Oct. 4, 2011) (citations omitted).

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's determinations of witness credibility, which

will not be disturbed absent clear and convincing evidence to the contrary. *See **Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002). Questions of law are reviewed de novo with no presumption of correctness. ***Langschmidt v. Langschmidt***, 81 S.W.3d 741 (Tenn. 2002). We proceed mindful that only a single statutory ground must be clearly and convincingly established in order to justify a basis for termination. ***In re Audrey S***., 182 S.W.3d 838, 862 (Tenn. Ct. App. 2005).

IV.

A.

The trial court terminated Father's rights based on two forms of abandonment: (1) failure to pay child support and (2) conduct that demonstrates a wanton disregard for the welfare of the Children. We address Father's challenge to both of these grounds in this section.

Tenn. Code Ann. § 36-1-113(g)(1) (Supp. 2013) provides that a parent's rights may be terminated on the ground of abandonment as defined in Tenn. Code Ann. § 36-1-102(2010). As relevant in the present case, the statute defines abandonment as follows:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child.

B.

We first consider the trial court's finding that Father, prior to his incarceration, engaged in conduct that demonstrated a wanton disregard for the welfare of the Children. With regard to the "wanton disregard" ground, this Court has elaborated as follows:

> Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong

indicator that there may be other problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. Taxonomy of Children's Rights, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S*., 183 S.W.3d at 866.

In terminating Father's rights, the trial court stated:

The court finds that the state has proven the wanton disregard ground of abandonment by clear and convincing evidence because: [F]ather has an alcohol abuse issue as evidenced by his prior conviction for D.U.I., his testimony that he would become intoxicated while sitting in his car at his residence once a month or every two weeks, his testimony that he had been drinking alcohol on the eve of mother's death, the fact that the two children were in the car when [F]ather wrecked, he had an open container of beer, and the court's determination that [F]ather's testimony that he was not impaired when he wrecked is not credible. He pled guilty to felony death by vehicle. The fact that mother died is horrendous, and it was wanton disregard for the children's safety that they were in the vehicle.

The trial court properly summarized and considered the relevant evidence. Father asserts that his "two periods of incarceration" – in 1998 and in 2013 – do not demonstrate a "broader pattern of conduct" that shows he is unfit or poses a substantial risk of harm to the Children's welfare. We disagree. First, it is irrelevant that there was a span of years between Father's first alcohol-related conviction and his most recent one. As this Court has observed:

> [P]arental conduct exhibiting wanton disregard for a child's welfare may occur at any time prior to incarceration and is not limited to acts occurring during the four-month period immediately preceding the parent's incarceration. Moreover, we have held that a parent's poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children.

*Dep't of Children's Svs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. App. 2009)(internal citations omitted). The evidence shows that Father admittedly continued to drink alcohol to excess on a regular basis after his 1998 D.W.I. conviction. Clearly, Father decided to depart from his claimed practice of not driving while under the influence in 2010. This act of bad judgment not only resulted in Mother's death, but was psychologically traumatic for the Children. They themselves were involved in the accident and witnessed her death. In *Audrey S.*, we further stated: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." 182 S.W.3d at 867-68.

In another area, the evidence showed that T.F.H. was a concern for social service agencies in both North Carolina and Tennessee because of Father's failure to obtain appropriate medical care and treatment for her diabetes. Although Father claimed that T.F.H. had proper medication for her diabetes, the DCS case worker testified that the child had no active prescription for insulin after she came to live in this state. Further, school officials referred the child to DCS after she repeatedly came to school without the proper medication or testing supplies. The evidence further indicated that Father had failed to apply for TennCare benefits to cover T.F.H.'s care despite attempts by DCS and school personnel to assist him. Father conceded he had not taken T.F.H. to a specialist because of insurance issues.

On our review, the evidence does not preponderate against the trial court's findings. The record contains clear and convincing evidence to support the termination of Father's

rights on the ground that, prior to his incarceration, he abandoned the Children by his conduct evincing a wanton disregard for their welfare.

C.

We next consider the trial court's finding of abandonment by non-support. Again, with respect to Father, who was incarcerated at the time of the filing of the petition to terminate, the statute requires a showing that he has "willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding" his incarceration. Here, Father remained incarcerated since he went to prison on June 26, 2012. Accordingly, the relevant period for purposes of establishing abandonment is the four-month period before he was incarcerated from February 26, 2012, until June 25, 2012.

In finding that Father failed to support the Children, the trial court stated:

> [Father] admitted that he paid no child support during the seven months when he was not incarcerated.[3] He said that he told [Girlfriend] to find out if the children needed anything as he had heard that T.H. needed underwear. [Girlfriend] said that she took $200 to the DCS' office for the children, but that she did not tell anyone at the office that she had the $200 for the children. She said that [F]ather told her to take this money; [F]ather denied that he told [Girlfriend] this. The testimony was that [Girlfriend] took the money during [F]ather's incarceration; it is unclear whether [F]ather told her to see what the children needed while he was incarcerated or merely living in North Carolina before his criminal hearing. Ms. Huenergarde testified that [F]ather had several jobs while he was not incarcerated; she specifically remembered that he worked at one job packing toothbrushes.
>
> Father argues that his failure to pay support was not willful. He states that the permanency plans did not tell him to pay support. The court does note that . . . the plan dated May 7, 2012, and signed by [F]ather, has a "Child Support" section with an address for the mailing of support. This same section is included in the plan dated December 1, 2011.

---

[3]December 21, 2011 - June 26, 2012.

* * *

> [F]ather knew that his children required support as he testified
> that he told [Girlfriend] to determine what the children needed.
> Girlfriend testified that [F]ather told her to take $200 to DCS for
> the children's benefit. These facts circumstantially show that
> [F]ather's failure to pay support was willful. Also, [F]ather held
> several jobs . . . and was able-bodied and therefore capable of
> paying child support prior to his incarceration.

In the present case, Father admits that he never paid any child support at any time. Neither does he dispute that he worked prior to being incarcerated and had the ability to provide for the Children. Essentially, Father contends that his failure to pay child support cannot be deemed willful because he was unaware of his obligation to support the Children. This Court has addressed willfulness as an essential element for purposes of establishing abandonment in the context of parental termination cases. We have held that "[i]n order to safeguard a parent's fundamental right to the care and custody of his child, parental rights may not be terminated based on abandonment for failure to support unless clear and convincing evidence shows that the parent's failure to make reasonable payments toward the support of his child was willful." *In re J.J.C.*, 148 S.W.3d 919, 926 (Tenn. Ct. App. 2004) (citing *In re Swanson*, 2 S.W.3d 180, 184-85 (Tenn. 1999)). We have further observed as follows:

> Failure to pay support is "willful" if the parent "is aware of his
> or her duty to support, has the capacity to provide the support,
> makes no attempt to provide support, and has no justifiable
> excuse for not providing the support." The fact the parent was
> not under an order to pay support is not dispositive of the
> question of whether the failure is willful; the obligation to pay
> support exists in the absence of a specific order. The foregoing
> notwithstanding, a parent cannot be said to have abandoned a
> child when his failure to support is due to circumstances outside
> his control.

*In re Mark A.L.*, No. M2013-00737-COA-R3-PT, 2013 WL 5536801 at *4 (Tenn. Ct. App. M.S., filed Oct. 4, 2013)(internal citations omitted).

At trial, Father took the position that no one ever advised him of the need to provide child support. Questioned whether he had "ever attempted to pay child support," Father answered:

-10-

Well, no, because - - Well, really, I didn't know what I had to do. I didn't know I had to do it. And since no one ever explained to me what I had to do, well, I didn't think I needed to do anything.

Although the permanency plan did not require Father to pay child support, it did note the location of the child support receiving office. In addition, the criteria for termination which Father signed expressly included the failure to pay child support. At trial, Girlfriend testified that Father at one point asked her to take money to DCS for the Children. She said she complied with his request in November 2012 when she took $200 to DCS for the Children. She said, however, she "was there for many hours waiting and they never came," so she never gave them the money and still had it. Father's direct testimony continued:

Q: Have you attempted to send child support through someone else to [DCS]?

A: No, I never tried to pay anything or send somebody to pay anything. But one time I told [Girlfriend] to pay some money so that [the Children] could buy themselves the things because I had already talked to my daughter and she had told me what they need[ed]. Or I told [Girlfriend] to go and ask them what they need[ed].

In our view, Father's own testimony evidences his awareness of his duty to provide for the Children's needs and his admitted failure to meet his obligation. He offered no justifiable reason for failing to provide any child support to the extent that he was able to do so before going to prison.

The evidence at trial does not preponderate against the trial court's findings made by clear and convincing evidence. The trial court did not err in terminating Father's rights for abandonment by willful failure to pay child support.

V.

As an additional ground for termination, the trial court found that Father committed severe child abuse pursuant to Tenn. Code Ann. § 36-1-113 (g)(3), as defined in Section 37-1-102(b)(23) (Supp. 2013). The latter section defines severe child abuse as the "knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is

-11-

likely to cause serious bodily injury or death." In support of its decision, the trial court stated:

> The court recognizes that [F]ather's felony death by vehicle conviction has an element of the crime that the act was "unintentional." However, this court is not constricted to the burden of beyond a reasonable doubt or that the criminal proceeding says "unintentional." Here, [Father] had been drinking the eve prior to the wreck by his own admission, and said that he had an open beer in the vehicle when he wrecked. The court, as previously stated, believes that he was under the influence on the date of the crash, and that his testimony about the wreck was not credible. He certainly knew that drinking and then driving could have dire consequences for his family. He had previously been convicted of driving under the influence, and he stated that when he became intoxicated once a month or every two weeks, he drank sitting in his car at his home, and did not move the vehicle.
>
> This definition of severe abuse also requires a finding that the "exposure" of the child to the abuse "is likely to cause great bodily harm or death." In the matter at hand, the children were in the vehicle with father as the driver. Father crashed, and the children's mother was killed. The children might have died as well. The risk of harm or death because of driving while impaired is certainly "great."

With respect to the ground of severe child abuse, Father argues simply that it was not clearly and convincingly proven because there was "no evidence that the children suffered any physical harm" in the accident that killed Mother. To this point, the trial court expressly relied on that part of the statute defining "severe child abuse" as the "knowing exposure of a child to . . . abuse or neglect that is likely to cause serious bodily injury or death. . . ." In considering the evidence, the trial court did not find credible Father's testimony that he was not intoxicated at the time of the crash. On the evidence presented at trial, we agree with the trial court's assessment that Father's decision to drive while intoxicated with the Children in the car constitutes severe child abuse in that they were knowingly exposed to a substantial risk of harm or death – the fate that befell Mother.

In a somewhat related context, this Court has cited with approval case law "supporting a finding of severe child abuse for a parent exposing a child to drugs in utero, whether or not

-12-

the child actually sustains harm." ***In re Shannon P*.**, No. E2012-00445-COA-R3-PT, 2013 WL 3777174 at * 5 (Tenn. Ct. App. E.S., filed July 16, 2013)(citing ***In re Benjamin M.***, 310 S.W.3d 844, 848 (Tenn. Ct. App. 2009) ("the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed.")); ***Cornelius v. State, Dep't. of Children's Servs***., 314 S.W.3d 902, 910 (Tenn. Ct. App. 2009).

On our review, we conclude that the evidence does not preponderate against the trial court's findings of fact. There is clear and convincing evidence to support the trial court's termination of Father's rights on the ground that he engaged in severe child abuse.

## VI.

In the present case, after finding the existence of grounds for termination, the trial court undertook its best interest analysis. Guided by the non-exclusive list of statutory factors in Tenn. Code Ann. § 36-1-113(i), the trial court concluded, by clear and convincing evidence, that the "factors weigh heavily" in favor of termination. Father does not appeal the trial court's best interest determination. Again, however, before terminating a parent's rights, a court must determine that two things have been clearly and convincingly proven – "not only that statutory grounds exist but also that termination is in the child's best interest." ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002)(citing Tenn. Code Ann. § 36-1-113(c)). Accordingly, we have nonetheless reviewed the trial court's best-interest determination.

The Children's foster parents had already adopted three young children and wanted to adopt the Children as well. By all accounts, the Children were happy and neither had expressed any concerns about their foster home. Their therapist described it as "a wonderful little family coming together there." She believed that removing the Children from their foster family would cause them to "go even farther backwards than even [when] the death happened because they've had a regular family, a stationary family, someone that is involved with their school, their health." Our review of the record satisfies us that there is clear and convincing evidence to support the trial court's finding that termination of Father's parental rights best serves the Children's interest. We therefore uphold the termination order.

## VII.

The judgment of the trial court terminating Father's parental rights is affirmed. Costs on appeal are taxed to the appellant, A.F.C. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE