IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs March 13, 2014

IN RE C.L. ET AL.

**Appeal from the Juvenile Court for Rhea County**
**No. 11-JV-54      James W. McKenzie, Judge**

**No. E2013-02035-COA-R3-PT-FILED-MAY 28, 2014**

A.L. ("Mother") appeals the termination of her rights with respect to her five minor children (collectively, when referring to all five, "the Children"). The Department of Children's Services ("DCS") placed the Children in temporary state custody based on the youngest child's exposure to methamphetamine in utero. The court found that Mother's conduct constituted severe abuse against that child; consequently, the court relieved DCS of its obligation to make reasonable efforts toward reunification of the Children with Mother. Some 17 months after the Children were placed in foster care, DCS initiated these termination proceedings. After a bench trial, the court terminated Mother's rights based on its finding of multiple grounds for termination and its further finding that termination is in the best interest of the Children.[1] Both findings were said by the trial court to be made by clear and convincing evidence. Mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., C.J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and JOHN W. MCCLARTY, JJ., joined.

J. Shannon Garrison, Dayton, Tennessee, for the appellant, A.L.

Robert E. Cooper, Jr., Attorney General and Reporter, and Alexander S. Rieger, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

---

[1]The Children's biological father, C.J.L. ("Father"), was a party in the initial juvenile court proceedings. He committed suicide in September 2012, prior to the filing of the termination petition. We refer to him only as necessary to recite the facts relevant to Mother's appeal.

**OPINION**

**I.**

In June 2011, Mother and her then-four children[2] were living in the home of Mother's sister, L.W. Father had been jailed weeks earlier on a probation violation. One child suffered with cerebral palsy and required specialized medical care. The child received special needs educational instruction. On June 20, police raided the house and found components used to manufacture methamphetamine. Two males were arrested. Mother was not in the house at the time. The family was referred to DCS based on allegations that the children were being exposed to drugs in the house. Three days later, DCS located Mother and administered drug screens to her and L.W. Both women tested positive for methamphetamine and Mother also tested positive for oxycodone. Mother denied any drug use. An immediate protection agreement was entered into by DCS and Mother by which the children were placed with their paternal grandmother, R.R.

In July 2011, Mother and L.W. were administered hair follicle drug tests. Both tested negative. The following month, DCS filed a "Petition for Order Controlling Conduct and For Protective Supervision." The petition alleges that "[o]n the evening of June 20, 2011, police raided a home where [Mother] and the minor children had been staying, and found components used in the manufacture of methamphetamine." Mother and Father waived a preliminary hearing and conceded there was probable cause to remove the children from them based on Mother's drug use while the children were under her care and supervision. The court granted Mother supervised visitation and ordered the children to remain with their grandmother pending a further hearing.

At an adjudicatory hearing on September 8, 2011, it was agreed that the matter would be held in abeyance for 60 days. The children were returned to Mother's custody after Mother passed hair follicle and urine drug tests. Father tested positive for methamphetamine and was prohibited from living in the home. His contact with the children was to be supervised. On September 23, 2011, Child Protective Services was summoned after receiving information that weeks earlier, on September 9th, Mother had delivered prematurely her fifth child. The infant was born with methamphetamine, amphetamine and opiates in her system. At the time of delivery, Mother tested positive for the use of opiates. On September 25, DCS tested Mother again and she was negative at that time. Mother admitted to using methamphetamine, but claimed she had stopped when she learned she was

_____

[2]As previously noted, the defined term "the Children" pertains to all five of the children. When the "c" in children is not capitalized, the word "children" with a lower case "c" pertains to the four children born to Mother before the birth of the fifth child on September 9, 2011.

pregnant. She had no explanation as to how the infant had methamphetamine in her system at birth. The infant was placed in 48-hour protective custody, while the other children remained with their grandmother. At the same time, R.R. informed DCS that she was unable to care for all five Children long-term. As a result, DCS removed the Children into temporary, protective custody and filed a petition alleging that the Children were dependent and neglected in their Mother's care and that Mother had severely abused the recently-born infant by exposing her to drugs in utero. The Children were initially placed in two different foster homes – three in Hixson and two in Pikeville.

In October 2011, DCS created a family permanency plan with a goal of reunification of the Children with their Mother. Mother and Father had separated and Mother was living in her mother's home. Generally stated, the plan required that Mother submit to random drug screens, undergo an alcohol and drug assessment, attend parenting classes, obtain safe, stable housing and a legal income and provide DCS the necessary documentation reflecting her completion of these requirements. Mother signed the plan as well as the criteria for termination of parental rights provided to her by DCS.

At a November 2011 adjudicatory hearing, Mother did not contest the allegations of dependency and neglect as to all the Children. The parties agreed to hold the allegation of severe abuse against the infant in abeyance for three months in order to assess both parents' progress. In December 2011, DCS began providing Mother with in-home drug abuse services by "Health Connect" as they sought to find a treatment program for her that did not require insurance. In addition, Mother completed an alcohol and drug assessment that recommended she attend Narcotics Anonymous. That same month, Mother and Father lost their home after failing to pay rent. They moved in with Mother's mother. Mother was arrested for felony possession of drug paraphernalia and admitted to continued use of methamphetamine. In January 2012, Mother failed a drug screen for methamphetamine and marijuana. DCS records reflect that there was space available for her at an in-patient drug treatment facility in Chattanooga at no costs to her, but that she declined.

By May 2012, the Children were reunited in the same foster home. Following a hearing, the court found that there was clear and convincing evidence that the youngest child was subjected to severe abuse based on its exposure to drugs in utero. The court ordered that a severe abuse finding would be held in abeyance for three months. The court further ordered that if Mother failed to complete her requirements under the permanency plan within that time, it would direct DCS to file a termination petition. The permanency plan was revised to require Mother to undergo a mental health assessment and added adoption as a goal. On May 25, 2012, Mother failed another hair follicle drug screen when she tested positive for methamphetamine.

In July 2012, Mother was ordered to begin paying child support of $55 per month per child. The week before trial, she paid a single payment of $300, which was her only payment. She began missing appointments with Health Connect and declined or failed to respond to her case worker's attempts to administer a urine drug screen. At an August 9, 2012, status hearing, the juvenile court found that Mother committed severe abuse against the youngest child "due to ingestion of methamphetamine in utero." Based on its severe abuse finding, the court relieved DCS of any further obligation to expend reasonable efforts to assist Mother in regaining custody. Despite the order, DCS continued to provide, for a time, in-home drug counseling to Mother. At the hearing, the guardian ad litem recommended that DCS pursue permanency for the Children because "no appreciable effort" was made by either parent toward reunification.

On October 1, 2012, DCS ceased providing Mother with alcohol and drug treatment services. The DCS case worker, after speaking with Mother's counselors from Health Connect, elected not to request further funding to provide Mother with services because of Mother's lack of participation in the scheduled in-home counseling sessions. The case worker noted that DCS did provide Mother with information on alternative, community-based resources available to her at her option. She was also provided with contact information for a free drug counseling program, but Mother declined to participate in the program.

In November 2012, the court suspended Mother's visitation with the Children. The case manager testified that the Children (1) had no reaction to the end of the visits, (2) talked openly about it, and (3) were not upset. Their enthusiasm for the visits had gradually decreased as the months passed.

On February 1, 2013, DCS filed a petition to terminate Mother's parental rights. A bench trial was held on April 4, 2013. At that time, the Children ranged in age from 1 ½ to 10 years old. They had been in foster care for over a year and a half.

At the time of trial, Mother had lived for the previous five months with her boyfriend, J.H., in a trailer. J.H. did not appear at the trial. According to Mother, J.H. had long held a full-time job, had no criminal history, did not use drugs, and was receptive to having the Children join her in his home. They planned to be married. Mother admitted that she was dependent on her boyfriend and her mother for support. The proof indicated Mother had two brief periods of employment at "Goodman's" during 2012. She quit the first time because the workplace was "hot." The second time, she was fired for absenteeism. Mother explained, "I didn't show up. I had a lot of things happen at the time and I didn't have a way to work." Mother had since obtained her driver's license and said she looked for work nearly every day.

Mother received in-home drug counseling services from December 2011 until October 2012, when DCS discontinued funding. She conceded that DCS then informed her about a free, faith-based drug program available to her, but said she was never provided with the contact information. Mother testified she had been "clean for a while" and could pass a drug screen, but admitted she had relapsed two or three times after the Children were removed.

Mother took the position that DCS never intended that she would regain custody of the Children. She said "they were talking about termination of my rights from the get-go." Mother explained that she completed some steps but conceded she never established a stable home, had not shown legal income, and did not pay child support as ordered. Furthermore, she did not participate in recommended drug treatment through Narcotics Anonymous or the residential or out-patient programs to which she was referred. Mother testified that her visits with the Children gradually decreased and stopped altogether because DCS "just quit letting me see them." Mother professed that she was a "great mom" but made a mistake with drugs. She reasoned that her past conduct was no basis for taking the Children from her forever.

At trial, DCS essentially argued that Mother was given ample opportunity to address her drug problems and time to complete the other steps necessary to achieve reunification with the Children, all as outlined in the Children's permanency plan. The trial court essentially agreed. On August 12, 2013, the court terminated Mother's parental rights. In support of its order, the court found, by clear and convincing evidence, that multiple grounds for termination existed, to wit: (1) substantial non-compliance with the requirements of a permanency plan; (2) severe abuse of the child C.J.L.; (3) persistence of the conditions that prevented reunification of the Children with Mother; and (4) failure to provide a suitable home for the Children. The court further found, also by clear and convincing evidence, that termination was in the best interest of the Children. Mother filed a timely notice of appeal.

II.

Mother presents the following issues for our review, as taken verbatim from her brief:

> 1. Whether the Trial Court erred in finding that it was in the Children's best interest for Mother's parental rights to be terminated.
>
> 2. Whether Mother's due process rights were violated by [DCS] when DCS ceased paying for Mother's drug counseling, which . . . was required of Mother to reunite with the Children under the Permanency Plan.

III.

With respect to parental termination cases, this Court has observed:

> It is well established that parents have a fundamental right to
> the care, custody, and control of their children. While parental
> rights are superior to the claims of other persons and the
> government, they are not absolute, and they may be terminated
> upon appropriate statutory grounds. A parent's rights may be
> terminated only upon "(1) [a] finding by the court by clear and
> convincing evidence that the grounds for termination of parental
> or guardianship rights have been established; and (2) [t]hat
> termination of the parent's or guardian's rights is in the best
> interest[] of the child." Both of these elements must be
> established by clear and convincing evidence. Evidence
> satisfying the clear and convincing evidence standard establishes
> that the truth of the facts asserted is highly probable, and
> eliminates any serious or substantial doubt about the correctness
> of the conclusions drawn from the evidence.

*In re Angelica S*., E2011-00517-COA-R3-PT, 2011 WL 4553233 at \*11-12 (Tenn. Ct. App.
E.S., filed Oct. 4, 2011) (citations omitted). On our review, this Court has a duty to determine
"whether the trial court's findings, made under a clear and convincing standard, are
supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530
(Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record
accompanied by a presumption of correctness unless the preponderance of the evidence is
against those findings. *Id*.; Tenn. R. App. P. 13(d). Great weight is accorded the trial court's
determinations of witness credibility, which findings will not be disturbed absent clear and
convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).
Questions of law are reviewed de novo with no presumption of correctness. *Langschmidt
v. Langschmidt*, 81 S.W.3d 741 (Tenn. 2002).

IV.

As we earlier noted, Mother does not dispute the trial court's finding of the existence
of multiple grounds to support the termination order. We are mindful, however, that before
terminating a parent's rights, a court must determine that two things have been clearly and
convincingly proven – "not only that statutory grounds exist but also that termination is in
the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)(citing Tenn.
Code Ann. § 36-1-113(c)). We have considered the evidence pertaining to the cited grounds

for termination even though Mother raises no issues pertaining to them. We hold that the evidence does not preponderate against the trial court's finding that there is clear and convincing evidence to support each of the multiple grounds for termination. *See **In re Arteria H**.*, 326 S.W.3d 167, 184 (Tenn. Ct. App. 2010).

We next consider the issue of "best interest." Our review is guided by the statutory factors as set forth in Tenn. Code Ann. § 36-1-113(i)(Supp. 2013). That section provides:

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
>
> (7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol,

controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502 (Tenn. Ct. App. 2007) (citing *Dep't of Children's Servs. v. P.M.T.*, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App. Sept. 15, 2006)).

In the present case, the trial court expressly considered the evidence in light of each of the nine statutory factors. The court set forth its "best interest" determination as follows:

The Court finds [Mother] has not made any significant adjustment of circumstances, conduct, or conditions as to make it safe and in the children's best interest to be in her home. [S]he does not have independent housing or income to provide for herself or the minor children. Other than completing parenting classes and visiting with her children she has not completed any tasks on her permanency plan.

[Mother] has not made appropriate or lasting adjustments in her circumstances, after reasonable efforts by DCS, and whether she will, or can, is unknown.

[Mother] did visit with the children, until the Court found in November 2012, based on therapist's reports, that [it] was not in the children's best interests to have continued visits. Based on testimony and proof, it is not apparent to the Court that [Mother] has a meaningful relationship with the children.

The children have thrived in their current foster home, which is a s[t]able, loving and a prospective adoptive home. Any change of caretakers or physical environment is most likely to have a detrimental effect on the children's emotional and psychological health.

The Court previously found severe abuse by [Mother] against [a child], due to her drug use during pregnancy, which result[ed] in the child being born with drugs in her system.

Whether or not [Mother's] current home or physical environment is healthy or safe [is] unknown because she had not, until today, provided a current address to DCS and a home study and background investigation have not been done.

Clearly, [Mother] has not paid child support as evidenced by documentary proof and her own testimony.

Having reviewed all factors set out by statute, eight out of nine weigh[] in favor of termination and the proof as set out herein is clear and convincing that it is in the children's best interest that the parental rights of [Mother] be terminated.

For his part, Ted Engel, the guardian ad litem, offered the following pertinent closing remarks at trial:

[W]hen you look at the behavior of [Mother], the fact is that she was given a plan to work. She was given a plan to get stable housing. She didn't do it. She was given a plan to get a job. She quit a job because it was too hot. She was told to get drug free. She relapsed, as she said, and did not complete treatment. And then she gets up here and virtually everything she could think of, every failure was on the part of [DCS] and not her.

[T]hese children . . . when you look at the contribution that their mother has made to their life, it may well be that the best thing she ever did for those children was to lose them because the fact is when you look at where they were going, they were going nowhere. . . . Now these children are developing. They're marching ahead in life. They stand a chance to be something

better than they otherwise would have been. And while their mother is standing in place, marching in place, these children are marching on.

In short, we conclude that the trial court properly summarized and thoroughly considered the relevant evidence in light of the applicable factors. The evidence does not preponderate against the trial court's findings. Moreover, we agree with the guardian ad litem's observations. The evidence showed that all five children had special needs and were doing well together in their therapeutic, prospective adoptive foster home. One had multiple disabilities related to his cerebral palsy and required ongoing therapy, visits to numerous physicians, and constant care and supervision at home. The Children had made discernable progress and improvements in their behavior, educational performance, and other areas of concern. They were adjusting to their father's death and showed no apparent difficulty stemming from the lack of contact with Mother. The Children had spent some 19 months in foster care. During this time, when someone else took on the responsibility of caring for the Children full-time, Mother was afforded a chance to focus all her attention on "working the plan" to regain custody. She made little progress. She essentially completed parenting classes and had an alcohol and drug assessment. She attended drug counseling for a time, but otherwise did not actively address her drug abuse. More than once, since the Children were removed, she relapsed and used methamphetamine. Simply put, Mother never demonstrated a real effort to turn her life around so that she could put the Children first. There is clear and convincing evidence that the Children's interest are best served by permanently severing Mother's ties to them and allowing them a chance for permanency in a safe, stable, and loving home.

V.

Mother asserts that she was denied due process when DCS ceased paying for her alcohol and drug treatment without notice and without affording her an opportunity to be heard. The gist of Mother's argument is that without such treatment, which was required of her under the Children's permanency plan, she could not achieve reunification with the Children.

DCS responds that Mother may not raise her due process argument for the first time on appeal. DCS is correct. "Issues not raised in the trial court cannot be raised for the first time on appeal." *Barnes v. Barnes*, 193 S.W.3d 495, 501 (Tenn. 2006) (citing *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991)). Accordingly, Mother has waived this issue. The waiver notwithstanding, we have concluded, in our review of the evidence, that Wife's "due process" argument lacks merit.

-10-

As DCS correctly notes, a court may relieve DCS of reasonable efforts in assisting a parent with reunification where the parent has subjected a child or its sibling to aggravating circumstances as defined in Section 36-1-102. *See* Tenn. Code Ann. § 37-1-166(g)(4)(A). Section 36-1-102(9) defines "aggravating circumstances," in relevant part, to include "severe child abuse." In turn, "severe child abuse" includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death. . . ." *See* Tenn. Code Ann § 37-1-102(b)(23)(A). This Court has held that a Mother's prenatal drug use may constitute severe child abuse. ***In re Benjamin M.***, 310 S.W.3d 844 (Tenn. Ct. App. 2009).

Beginning in December 2011, DCS provided in-home drug counseling to Mother as it worked to help her find a suitable drug treatment program. In August 2012, Mother, represented by counsel, appeared for a hearing in juvenile court. The court found that Mother committed severe abuse by exposing the child to methamphetamine in utero and relieved DCS of its obligation of further reasonable efforts toward reunification. Despite the court order relieving DCS of "reasonable efforts," DCS continued to provide Mother with drug counseling. In October 2012, however, after consultation with Mother's drug counselors, DCS declined to pursue further funding, citing Mother's lack of participation and her refusal to submit to drug screens. Mother did not contest the juvenile court's finding that the child was severely abused in utero.

In summary, Mother was afforded notice and an opportunity to be heard – and did appear – at the adjudication of the dependency and neglect action in the juvenile court. At no point did she contest the severe abuse finding. Based on the severe abusing finding, the juvenile court acted within its discretion by relieving DCS of its obligation to expend reasonable efforts to assist Mother further. In turn, DCS had no obligation from that point forward to assist Mother toward the goal of reunification. Accordingly, Mother's due process rights were not violated in the case at bar when DCS discontinued funding for drug counseling services.

VI.

The judgment of the trial court terminating Mother's parental rights is affirmed. Costs on appeal are taxed to the appellant, A.L. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and the collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., CHIEF JUDGE