### In re BENJAMIN M.

Court of Appeals of Tennessee, Eastern Section, at Knoxville.

Sept. 15, 2009 Session.

Oct. 30, 2009.

Permission to Appeal Denied by Supreme Court March 15, 2010.

Robert W. Rogers, Knoxville, Tennessee, for the appellant, Jessica M.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; and Douglas Earl Dimond, Senior Counsel; Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

## OPINION

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and D. MICHAEL SWINEY, J., joined.

This proceeding was initiated by the Tennessee Department of Children's Services ("DCS") by petition alleging that Benjamin M. ("the Child") was born dependent and neglected within the meaning of Tenn.Code Ann. § 37–1–102(b) (2005 and Supp.2009) because his mother, Jessica M. ("the Mother"), abused drugs during her pregnancy. The same petition alleges that Mother's drug abuse constitutes severe child abuse as defined in Tenn.Code Ann. § 37–1–102(21) (now renumbered (23) in 2009 Supp.) because it was done with the knowledge that it was causing great bodily harm to the Child based on the Mother's previous experience in giving birth to another child harmed by her drug abuse during pregnancy. The Mother conceded that the Child was dependent and neglected and the juvenile referee entered an order accordingly. The order reserved the issue of whether the same conduct constituted severe child abuse. In a later hearing, the Mother challenged the allegations of severe child abuse, arguing that what she did during her pregnancy could not constitute abuse of a "child" because, according to her, the unborn baby was not a child. The case was initially tried before a referee who made lengthy specific findings of fact and concluded that the Child was the victim of severe child abuse. The parties stipulated to the referee's specific findings of fact at trials before the juvenile court and the trial court, both of which found that the Mother's conduct constituted severe child abuse. The Mother appeals. We affirm.

## I.

As noted above, the facts are not in dispute. The findings of the referee, which, as previously noted, were stipulated to by the parties, are as follows:

From the witness stand, the [M]other told the Court that prior to Benjamin's birth she had given birth to a child, Ashton ... on July 31, 2004, and that immediately following Ashton's birth, the child had to be treated for withdrawal symptoms brought about by her illegal use of methadone through the course of her pregnancy with Ashton. The [M]other also stated that she used oxycotin obtained off the street without a legal prescription during her pregnancy with Ashton. Ashton and another sibling were eventually placed into the custody of her sister because of the [M]other's drug addiction.

In the days following the birth of Ashton, the [M]other was referred to a methadone clinic for help with her addiction. After a short period of time the [M]other was expelled from the methadone clinic because of her use of methamphetamine, a clear violation of the clinic's rules.

The [M]other further testified that on August 5, 2005, she discovered that she was pregnant with Benjamin after being taken to a hospital for treatment of a possible drug overdose. The [M]other admitted that while at the hospital she tested positive for methamphetamine, cocaine, and valium. The [M]other further informed the Court that at least one doctor told her to take methadone only as prescribed when pregnant and not to take or use any other illegal drugs or substances because of the risks of harm to her unborn child. Despite this knowledge, the [M]other failed to heed the advice of her doctor and used methadone purchased off the street illegally in the time period between August 5, 2005 and January 26, 2006 when she came

under the care of a methadone clinic once again. Additionally, the [M]other admitted to having no prenatal care after August 5, 2005 until a doctor's visit in December of 2005 at which time she tested positive for opiates.

Shortly after Jessica ... reentering a methadone treatment program, Benjamin [M.] was born prematurely at thirty-five and 1/7 weeks on February 7, 2006 at the University of Tennessee Medical Center. Following his delivery, the [C]hild began exhibiting distinct signs of opiate withdrawal that required medical treatment using phenobarbital and later, morphine. Because of his prematurity and his withdrawal symptoms, Benjamin was moved to the neonatal intensive care unit. Dr. Miriam Weinstein, a pediatric physiatrist with extensive experience in devising rehabilitation treatment programs for infants and children who have been harmed by in utero drug exposure, was called in for a consultation on the [C]hild's treatment on February 10, 2006. Dr. Weinstein's initial impression was that the [C]hild was suffering from sensory processing problems as evidenced by his hypersensitivity to touch because of his in utero exposure to methadone that would require extensive treatment to include speech, occupational, and, ... physical therapies. Additionally, Dr. Weinstein testified at trial that the various drugs the [C]hild's [M]other used during her pregnancy with Benjamin unquestionably placed the [C]hild at risk of other serious bodily injuries or death.

After Benjamin's discharge from the hospital on February 23, 2006, Dr. Weinstein last saw Benjamin at her office in July of 2006 at which time she observed that the [C]hild was continuing to exhibit significant ill effects from his drug exposure in utero that would require additional therapies for some time to come and that without the additional treatments he would experience further developmental delays.

Additionally, on February 9, 2006, at the hospital where Benjamin was being treated, the [M]other made telling admissions to Stephanie Elliott, the Child Protective Services investigator assigned to investigate Benjamin's report of harm. The [M]other told Ms. Elliott that she was a drug addict who had been using illegal drugs since she was fourteen years of age. The [M]other went on to say that she used marijuana, opiates, and cocaine just prior to her being told that she was pregnant with Benjamin on August 5, 2005, and that she later used opiates for which she tested positive in December of 2005.

The [M]other also told Ms. Elliott about her use of methadone and oxycotin during the course of her pregnancy with Ashton ... and that Ashton also had to be treated for severe withdrawal symptoms in much the same way as Benjamin.

Based upon his specific findings, the referee found, by clear and convincing evidence, that the Child was the victim of severe child abuse as defined in the statute because the Mother "did knowingly expose her child to a substantial risk of serious bodily injury or death by means of her illegal drug use during pregnancy which drug use did in fact cause serious bodily injury to her child requiring significant and extended medical treatment after the child's birth." The issue of severe child abuse was considered *de novo* by the juvenile court and later by the trial court based upon the above stipulated facts, and both courts affirmed the referee's order in all respects.

## II.

The Mother presents three variations of the dispositive issue which, restated by us,

is whether the Mother's drug abuse during pregnancy that resulted in the Child being born drug addicted and injured constitutes severe child abuse pursuant to Tenn.Code Ann. § 37–1–102(b)(21) (now subsection (23)). This issue, based as it is on stipulated facts, is purely one of law.

## III.

### A.

We review the trial court's conclusions of law *de novo* with no presumption of correctness. *Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn.2002). The application of a statute to facts that are not in dispute is a question of law subject to the aforesaid *de novo* review. *Lawrence County Educ. Ass'n v. Lawrence County Bd. of Educ.,* 244 S.W.3d 302, 309 (Tenn. 2007).

### B.

The Mother's argument, at its core, is that the definition of "child" found at Tenn.Code Ann. § 37–1–102(b)(4)(A) as "[a] person under eighteen (18) years of age" does not include a fetus; therefore, drug abuse during pregnancy cannot constitute abuse to the Child born after the drug abuse. DCS argues that the Mother's argument misses the point because the fetus did not stay a fetus but became a child that sustained injury at the hand of the Mother. DCS argues that the law, as reflected in the statute and the cases, clearly establishes "that a parent may be held responsible for the prenatal conduct that exposes the child, once born, to great bodily harm." We agree with DCS.

DCS refers us to cases that support the proposition that prenatal drug use can sustain a finding of parental conduct toward a later-born child egregious enough to justify a termination of parental rights. The first is *In re M.J.J.,* No. M2004–02759–

COA–R3–PT, 2005 WL 873305 (Tenn.Ct. App. M.S., filed April 14, 2005). M.J.J. was born with opiates and methamphetamine in his system. His mother tested positive for methamphetamine, and admitted ingesting hydrocodone, alcohol and other non-prescribed drugs during her pregnancy. DCS stepped in and took temporary custody of M.J.J., but tried to reunite him with his mother. The attempts were unsuccessful and the mother's parental rights were terminated on numerous grounds, one of which was severe child abuse pursuant to Tenn.Code Ann. § 37–1–102, the same statute presently before us. On appeal, we analyzed the issue as follows:

> In the present case, the juvenile court found that Mother had committed severe child abuse by using methamphetamine during her pregnancy with M.J.J. The court found that, by taking this illegal, controlled substance, Mother had exposed M.J.J. to a substantial risk of great bodily injury ... The record reflects that Mother also ingested hydrocodone, alcohol and other non-prescribed over-the-counter medications. M.J.J. was born with tremors as a result of the prenatal exposure to these illicit drugs Mother was taking during her pregnancy. Fortunately, it appears that M.J.J. has otherwise enjoyed a healthy childhood. However, the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed. Therefore, we conclude that the record clearly supports the trial court's finding that Mother's prenatal drug use constituted severe child abuse for purposes of parental rights termination.

2005 WL 873305 at *8.

DCS also relies upon *In re C.T.S.,* 156 S.W.3d 18 (Tenn.Ct.App.2004). The mother's rights had been terminated under

Tenn.Code Ann. § 36–1–113(g), which allowed termination of parental rights for abandonment. Abandonment was defined to include an incarcerated parent who, prior to incarceration, "exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36–1–102(1)(2001). The term "child" was defined, and remains defined, in Tenn.Code Ann. § 36–1–102(13) (2001 and Supp.2009) identical to the definition of "child" in § 37–1–102(b)(4)(A). We affirmed the termination with the following statement:

> Having reviewed the entire record in this case, including Mother's testimony at trial, we affirm termination of Mother's parental rights for abandonment as defined.... It is clear that Mother ingested crack cocaine during her pregnancy and immediately before the birth of C.T.S., knowing the effects it would have on her child. Mother's knowledge of these effects, moreover, was more than theoretical as she previously had given birth to a child who also was born addicted to cocaine. Such conduct clearly exhibits a wanton disregard for the welfare of the child.

*Id.* at 25. We agree with DCS that *C.T.S.*[1] and *M.J.J.* support a holding that severe child abuse can result from prenatal drug use.

Although *M.J.J.* did not discuss statutory construction, the plain statutory language supports the result. The plain language of an unambiguous statute is the starting and ending place for determining legislative intent. *U.S. Bank, N.A. v. Tenn. Farmers Mut. Ins. Co.*, 277 S.W.3d 381, 386 (Tenn.2009). The statutory scheme affording protection to juveniles, Tenn.Code Ann. §§ 37–1–101, et seq. (2006 and Supp.2009), unmistakably contemplates intervention based upon present conduct to prevent future injury, as well as consequences for past conduct that has caused a present injury or is likely to cause a future injury. One stated legislative purpose is to "[p]rovide for the care, protection, and wholesome moral, mental and physical development of children...." *Id.* § 37–1–101(a)(1). Development obviously spans time, from birth to majority. Likewise, the term "abuse" is defined to include a child who "*is* suffering from, *has* sustained, or *may be* in immediate danger of ... sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent...." *Id.* § 37–1–102(b)(1) (emphasis added). Similarly, the term "severe child abuse" includes:

> (A) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is *likely to cause* great bodily harm or death....
>
> (B) Specific brutality, abuse or neglect towards a child that in the opinion of qualified experts *has caused* or *will reasonably be expected to produce* severe psychosis, severe neurotic disorder, severe depression, severe developmental delay or retardation, or severe impairment of the child's ability to function adequately in the child's environment, and the knowing failure to protect a child from such conduct.

Tenn.Code Ann. § 37–1–102(21) (2005) (renumbered (23) in 2009 Supp.) (emphasis added). Obviously, the wording we have emphasized shows that a finding of abuse can be based on conduct that occurs at one time and injury that occurs at another.

The Mother's argument that all the components of abuse must "exist concurrently"

---

1. The holding of the third case relied upon by DCS, *In re S.L.A.*, 223 S.W.3d 295, 300 (Tenn. Ct.App.2006), is consistent with *C.T.S.*, but the facts are arguably distinguishable because the mother of S.L.A. continued her drug use after the baby's birth.

is a prime example of circular reasoning that offers nothing other than its own weight for support. It proceeds along the line that a fetus is not a child, therefore, harm to a child knowingly inflicted *before birth* cannot be harm to, or abuse of, a child, and, therefore, the child must be a child and not a fetus when the knowing act or failure to act happens. To accept this argument is to ignore the clear intent of the legislature as expressed in the language of the statute and tie the hands of anyone trying to "[p]rovide for the care, protection, and wholesome moral, mental and physical development of children."

Mother does an admirable job of trying to shift the focus away from the Child to any subject matter that offers her more favorable law. For example, the Mother relies on *Hamby v. McDaniel,* 559 S.W.2d 774 (Tenn.1977) and the later statutory abrogation of *Hamby*'s holding by 1978 Tenn. Pub. Acts, ch. 742 § 1, now codified in Tenn.Code Ann. § 20–5–106(c)(2009). *Hamby* held that a wrongful death action could not be maintained for a fetus that was injured and later stillborn, although such an action would have been available had the baby been born alive. The General Assembly later, in § 20–5–106, defined "person" to include a fetus that was viable at the time of injury. DCS appropriately points out, however, that the Child in the present case would be covered by either the common law "born alive" rule followed in *Hamby,* or the later statutory definition. The common law rule was "predicated upon recognition of the legal right of a child to begin life unimpaired by physical or mental defects from prenatal injuries, which right matures upon live birth and therefore survives [even if the child later dies from the injuries]." *Hamby,* 559 S.W.2d at 776 (emphasis omitted). We believe the same reasoning applies with equal or greater force to provide a child with the right to begin life free from the impairment of drug addiction and other ill effects of prenatal drug abuse.

The Mother's brief also mentions *Davis v. Davis,* 842 S.W.2d 588 (Tenn.1992), for the proposition that an unborn fetus is not a person. *Davis* involved a fight between a divorced couple over disposition of cryogenically-preserved human "preembryos," or fertilized human eggs. Even though the court stopped short of recognizing that fertilized eggs were persons, it recognized the "special respect . . . necessary to protect the welfare of potential offspring . . . [and] . . . obligations not to hurt or injure the offspring who might [later] be born. . . ." *Id.* at 596 (*quoting Journal of the American Fertility Society, Report of the Ethics Committee,* at 35S (June 1990)). Thus, *Davis* does not help the Mother.

The Mother also argues that two criminal cases support her position that a fetus is not a child. She is correct that *State v. Hudson,* No. M2006–01051–CCA–R9–CO, 2007 WL 1836840 (Tenn.Crim.App. M.S., filed June 27, 2007), and *Richards v. State,* No. E2004–02326–CCA–R3–PC, 2005 WL 2138244 (Tenn.Crim.App. E.S., filed Sept. 2, 2005), both hold that conduct during pregnancy cannot support a finding of criminal child abuse, but she fails to convince us that the criminal cases control the outcome in the present case. Our criminal law is premised upon society's accepted value that it is better for several guilty people to go free than to jail one innocent person. *Schlup v. Delo,* 513 U.S. 298, 325, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Proceedings in juvenile court under Title 37 are not criminal proceedings. *Jackson v. Bomar,* 215 Tenn. 9, 383 S.W.2d 41, 43 (1964). The focus of such proceedings is on the best interest of the affected child. *Id.; See also In re Valentine,* 79 S.W.3d 539, 546 (Tenn.2002) (statutory grounds must exist and termination must be in best interest of the child). Accordingly, we de-

cline to import the protections and definitions applicable to criminal child abuse into these civil proceedings. *See, e.g., In re R.C.P.,* M2003–01143–COA–R3–PT, 2004 WL 1567122 at *7 (Tenn.Ct.App. M.S., filed July 13, 2004) (holding that "knowing" abuse in Title 37 is not the same as "knowing" abuse under Title 39 which deals with criminal abuse).

We believe it is also important that both criminal cases relied upon an Attorney General opinion that supports the proposition that once the child is born alive, it is entitled to the protections afforded by Tenn.Code Ann. § 37–1–101 *et seq. See Attorney General Opinion,* No. 02–136, 2002 WL 31912595 (Tenn.A.G. December 23, 2002). In *Opinion* 02–136, the Attorney General gave his answer to the following questions:

Does a situation where a pregnant woman tests positive for methamphetamine trigger the child abuse reporting statute codified at Tenn.Code Ann. § 37–1–403? Under the reporting statute, is the hospital and/or the attending physician required to report when a child is born with illegal drugs in his or her system?

*Id.* at *1. After answering the first question in the negative, the *Opinion* gave the following positive response to the second question:

It is the opinion of this office that once the child is born Tenn.Code Ann. § 37–1–403 is implicated and a hospital or physician must report a positive drug test on that infant. Although the mother's ingestion of the illegal drugs takes place before the birth of the child, Tenn. Code Ann. § 37–1–403(a) requires that when a person has knowledge of "any child who is suffering from ... any wound, injury, disability, or physical or mental condition" caused or reasonably appearing to have been caused by brutality, abuse or neglect, that person

must report the harm. Title 37 contains the following definition of abuse:

(1) "Abuse" exists when a person under the age of eighteen (18) is suffering from, has sustained, or may be in immediate danger of suffering from or sustaining a wound, injury, disability or physical or mental condition caused by brutality, neglect or other actions or inactions of a parent, relative, guardian or caretaker.

Tenn.Code Ann. § 37–1–102(b)(1).

Further, we note that the statute uses the present tense—"is suffering"—in referring to the state of the child and uses the past tense—"has been caused by"—in referring to the actions that produced the child's present suffering. Neither of these statutes requires that the harm be inflicted after birth.

*Id.* at * 2. We believe *Opinion* 02–036 supports a holding that conduct during pregnancy can be the basis of a finding of abuse when that conduct causes harm to a child at or after birth.

The Mother also argues that recent unsuccessful attempts to add statutory terminology to include ingestion of drugs during pregnancy prove that the statute did not cover such conduct without the addition. We could just as easily speculate that the legislature rejected the addition as unnecessary in light of our holdings in *M.J.J., C.T.S.,* and *S.L.A.* The legislature is presumed to have known about those cases at the time it acted. *See State v. Powers,* 101 S.W.3d 383, 394 (Tenn.2003). We do not find this failed legislation to be particularly helpful.

In conclusion, we hold that the statutory language defining severe child abuse clearly reflects an intent that actions before a child is born can constitute abuse to a child that is born injured by those actions. When a child is born alive but injured, the

pre-birth timing of the actions is not dispositive.

## IV.

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellant, Jessica M. This case is remanded, pursuant to applicable law, for enforcement of the trial court's judgment and for collection of costs assessed below.