IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 4, 2018

## IN RE COLTON B.

**Appeal from the Juvenile Court for Overton County**
**No. 16-JV-122      Diana F. Monroe, Judge**
_____

**No. M2018-01053-COA-R3-PT**
_____

This is a parental termination case. The trial court terminated the parental rights of a mother based on the statutory grounds of severe child abuse, substantial noncompliance with a permanency plan, and failure to manifest an ability and willingness to assume custody or financial responsibility of the child. The mother appeals. We reverse in part, with respect to one ground for termination, but otherwise affirm the trial court's order terminating parental rights and remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part, Affirmed in Part, and Remanded**

BRANDON O. GIBSON, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and RICHARD H. DINKINS, JJ., joined.

William A. Cameron, Cookeville, Tennessee, for the appellant, Miranda H.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

Miranda H. ("Mother") has a long history of involvement with the Tennessee Department of Children's Services. Mother's first child was born in 2005. In 2008, Mother was admittedly "having issues with drug addiction" and was arrested on drug-related charges. DCS filed a petition to declare the child dependent and neglected, and the juvenile court of Overton County entered a restraining order preventing Mother from having any contact with the child unless supervised by DCS. According to the

restraining order, the court found probable cause to believe that Mother had left the child with the child's father, who was unable to care for her, and Mother was believed to be evading arrest and using morphine. She was deemed a flight risk and a danger to the child. In 2009, the juvenile court awarded custody of the child to Mother's mother ("Grandmother") and provided in the custody order that Mother would have to file a petition with the court should she desire to regain custody of the child. Mother never challenged the restraining order or sought to regain custody, so the child remained with Grandmother.

Over the next few years, Mother's continued involvement with drugs led to numerous criminal charges. Mother was admittedly "wanted" and "on the run for three years." During this period, Mother discovered that she was pregnant with a second child. Mother did not seek any prenatal care while she was pregnant, and she used morphine and Subutex during the pregnancy. When Mother went into labor and went to a local hospital to deliver the child, blood tests revealed her drug use, so doctors stopped her labor and transferred her to Vanderbilt University Hospital in Nashville. When the child, Colton, was born at Vanderbilt, he was not breathing and required intubation, suctioning, and ventilation to resuscitate him. He was premature, and doctors estimated that he was born at 36 weeks gestation. Colton was critically ill and spent approximately thirty days in the neonatal intensive care unit at Vanderbilt. He was drug screened and tested positive for morphine, buprenorphine, meperidine, opioids, and benzodiazepines. Colton developed signs of neonatal abstinence syndrome and had to be given morphine intravenously in order to control his withdrawal symptoms, which included tremors in his arms and legs, sniffling, sneezing, vomiting, diarrhea, and other symptoms.[1] Shortly after Colton's birth, Mother was interviewed by a detective with a local sheriff's department and reported that she had been using morphine and Subutex intravenously for several years and on a daily basis throughout her entire pregnancy. Four days after Colton's birth, Mother completed an alcohol and drug assessment, and the provider recommended that she enter a residential substance abuse treatment program. Due to outstanding warrants for violations of probation, Mother was arrested five days after Colton's birth. At the time, Mother and DCS believed that they knew the identity of Colton's father, but he had substance abuse issues and did not have a stable home or transportation. Grandmother informed DCS that she would be unable to raise the child because she had already adopted Mother's older child and could not raise another. The sister of the putative father agreed to take Colton and went through the home study process to become an approved foster home. DCS filed a petition to declare Colton dependent and neglected and sought an adjudication as to whether he was the victim of severe child abuse. The

---

[1] According to Colton's neonatologist, if a baby receives scores greater than eight on the neonatal abstinence scoring spectrum, doctors consider starting a narcotic to control the withdrawal symptoms. Colton's symptoms were rated at "very high" scores of 14 to 15 (and the highest that his doctor had ever seen in 30 years of practice was an 18). After 25 days in the hospital, Colton was still scoring over eight on the spectrum.

juvenile court entered a protective custody order granting temporary custody to DCS.

Upon his release from the hospital on August 26, 2015, Colton was placed with the sister of the putative father ("Foster Mother") in what was believed to be a relative placement. Mother participated in a child and family team meeting that same day, at the jail, and helped to develop a permanency plan for Colton with dual goals of return to parent or adoption. She was not allowed visitation with Colton due to her incarceration. The permanency plan required Mother to sign the necessary releases for DCS to obtain her substance abuse treatment records, follow the recommendations of her alcohol and drug assessment upon release from incarceration, notify DCS of changes in her medications, consent to urine and hair follicle drug screens, obtain a driver's license, secure stable employment, complete a domestic violence assessment and a psychological evaluation, and participate in supervised visitation upon her release from incarceration

In September 2015, when Colton was around six weeks old, DNA test results revealed that the putative father was not in fact the biological father of Colton. Still, the putative father's sister, Foster Mother, continued to care for Colton. Meanwhile, Mother was drug screened in jail and tested positive for THC/cannabinoids in October 2015. In November 2015, she was screened again and tested positive for opiates.

Mother's permanency plan was revised in February 2016, when Colton was six months old, to remove references to the putative father.[2] Mother remained incarcerated, so the child and family team meeting was held at the jail. The revised plan omitted the requirements of a domestic violence assessment and psychological evaluation but added requirements that Mother apply for health insurance, obtain stable housing upon release from incarceration, and avoid incurring additional criminal charges. Due to the length of time since Mother's alcohol and drug assessment, the plan provided that Mother would complete another. The plan also directed Mother to provide names of other possible putative fathers, but Mother was either unwilling or unable to do so, insisting to this day that she does not know the identity of Colton's father. Colton remained at an increased risk of developmental delays due to his birth history and was required to attend follow-up visits at the neonatal clinic and participate in Tennessee Early Intervention therapy, but his doctors concluded that he was making "excellent progress" in Foster Mother's care.

In April 2016, the juvenile court entered its final adjudicatory and dispositional order adjudicating Colton dependent and neglected and finding that he was the victim of severe child abuse perpetrated by Mother. Grandmother had filed an intervening petition for custody of Colton, but it was denied, with custody to remain with DCS. The court order relieved DCS of its obligation to provide reasonable efforts to assist Mother.[3]

---

[2] Due to the recusal of a trial judge, the August 2015 permanency plan had not been ratified, but the February 2016 revised plan was ratified by the court.

[3] "Pursuant to Tennessee Code Annotated section 37-1-166(g)(4)[], DCS need not make

Nevertheless, DCS continued its involvement with Mother as before the ruling.

On June 8, 2016, when Colton was ten months old, DCS filed a petition to terminate Mother's parental rights, alleging two grounds for termination – severe child abuse and abandonment by wanton disregard. Mother was released from jail on June 13. She tested negative on her first few drug screens and began supervised visitation with Colton twice a month. Mother completed a second alcohol and drug assessment and began an intensive outpatient substance abuse treatment program, which she completed in August, making "moderate progress in her recovery." She also completed parenting classes. Mother was living with a male friend, and DCS visited the home on more than one occasion. The male friend tested negative on drug screens, but Mother's case worker did not deem the house suitable for a child because it was so hazy with smoke that it made her eyes burn, there were barrels full of empty beer cans in the yard, and she observed pornography in the living room. The case worker also testified that the male friend was not, to her knowledge, willing to let Colton move into the home.

A revised permanency plan was formulated in August 2016, with a sole goal of adoption. The plan required Mother to continue participating in supervised visitation and to provide names of putative fathers. Beginning in October 2016, DCS's attempts to drug screen Mother were unsuccessful. In November, DCS drug screened Mother at her home, and she tested positive for opiates. Mother denied any drug use so DCS administered a second screen, which was positive for "bupronephrine (Suboxone/Subutex)."[4] The case worker arranged for Mother to take a hair follicle drug screen for further testing, but when the case worker arrived at Mother's house to transport her to the drug screening location, no one answered the door. The case worker's subsequent attempts to get Mother to submit to a hair follicle screen were also unsuccessful. Mother would later testify that she did not take a hair follicle screen "[b]ecause I don't trust them and I don't have no confidence in them."

On December 15, 2016, an order of voluntary dismissal was entered dismissing the first termination petition filed by DCS. That same day, DCS filed a separate termination petition alleging four grounds for terminating Mother's parental rights –

---

reasonable efforts to assist a parent whose parental rights have been previously terminated to a sibling or half-sibling of the child, or a parent who has committed severe abuse against the child or any sibling or half-sibling of the child." *In re Gabriella D.*, 531 S.W.3d 662, 668 n.8 (Tenn. 2017).

[4] The drug test result form apparently contains a misspelling. According to the Substance Abuse and Mental Health Services Administration, an agency within the U.S. Department of Health and Human Services, Buprenorphine is prescribed "to help people reduce or quit their use of heroin or other opiates, such as pain relievers like morphine." *Buprenorphine,* Substance Abuse and Mental Health Services Administration, *available at* https://www.samhsa.gov/medication-assisted-treatment/treatment/buprenorphine. However, Mother was not prescribed the drug by a doctor.

severe child abuse, failure to manifest an ability and willingness to assume custody or financial responsibility of the child, substantial noncompliance with a permanency plan, and persistent conditions. While the termination case was pending, Mother missed or refused several more attempted drug screens but completed some other tasks listed in her permanency plan. Mother began working at a grocery store a couple of weeks before trial.

The termination trial was held on April 18, 2017. By that time, Colton was twenty months old, and he had lived with Foster Mother and her two daughters since his discharge from Vanderbilt. The trial court heard testimony from the DCS family service worker assigned to Colton's case, an investigator for Child Protective Services who interviewed Mother after Colton's birth, Foster Mother, Grandmother, and Mother. The trial court received voluminous exhibits, spanning eighteen volumes of the record on appeal, including DCS's entire case file regarding Mother dating back to 2007, the deposition of Colton's neonatologist at Vanderbilt, and the deposition of the detective who interviewed Mother after Colton's birth. The trial judge had to take breaks at more than one point in the testimony in order for Mother's attorney to calm her down and ultimately threatened Mother with contempt if she did not compose herself and "behave." At the conclusion of the testimony, the trial judge announced that she found clear and convincing evidence to support termination of Mother's parental rights based on all four grounds asserted in the termination petition and that termination was in the best interest of Colton. The trial judge indicated that she deemed DCS's witnesses credible and Mother not credible. After the entry of a written order terminating Mother's parental rights, Mother timely filed a notice of appeal to this Court.

On appeal, we determined that the final order entered by the trial court was nearly a verbatim recitation of the termination petition and that the trial court failed to provide a rationale for its decision. *In re Colton B.*, No. M2017-00997-COA-R3-PT, 2017 WL 6550620, at *1 (Tenn. Ct. App. Dec. 22, 2017). As a result, we vacated the order of the trial court and remanded for the entry of an order that reflected that it was the product of the trial court's individualized decision-making and independent judgment. *Id.*

On remand, the trial court entered a lengthy and detailed written order terminating Mother's parental rights on May 9, 2018. Again, the trial court expressly found the DCS case manager, the CPS investigator, Foster Mother, the detective, and Colton's doctor to be "credible and very persuasive," notably omitting Mother and Grandmother from that list. The trial court found that the ground of persistent conditions had not been proven by clear and convincing evidence. However, for reasons that will be discussed in greater detail below, the trial court found by clear and convincing evidence that the grounds of severe child abuse, failure to manifest an ability and willingness to assume custody or financial responsibility, and substantial noncompliance were all sufficiently proven. The trial court further found, by clear and convincing evidence, that termination was in Colton's best interest. Mother timely filed a second notice of appeal.

## II. ISSUES PRESENTED

Mother raises the following issues, as we perceive them, for review on appeal:

1.    Whether clear and convincing evidence was presented to establish the following grounds for terminating Mother's parental rights:
(a)    persistent conditions;
(b)    substantial noncompliance with a permanency plan;
(c)    severe child abuse; and
(d)    failure to manifest an ability and willingness to assume custody or financial responsibility.

2.    Whether clear and convincing evidence supports the trial court's finding that termination was in the best interest of the child;

3.    Whether sufficient evidence supports the trial court's finding that DCS made reasonable efforts to reunite Mother and Colton; and

4.    Whether reversal is required because a conflict of interest existed among Mother, Foster Mother, and DCS, which led to prejudice against Mother in the handling of her case.

For the following reasons, we reverse in part, affirm in part, and remand for further proceedings.

## III. STANDARDS APPLICABLE TO TERMINATION PROCEEDINGS

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d 533, 546 (Tenn. 2015). Pursuant to the statute, a party who has standing to seek termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination listed in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that terminating parental rights is in the child's best interest, considering, among other things, the factors listed in Tennessee Code Annotated section 36-1-113(i). *Id.*

Because of the constitutional dimension of the parental rights at stake, the petitioner must prove both of these elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). Clear and convincing evidence produces a firm belief or conviction in the fact-finder's mind regarding the truth of the facts sought to be established, eliminating any serious or substantial doubt about the correctness of the findings. *Id.*

Due to the heightened burden of proof in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). First, we review the trial court's factual findings de novo in accordance with Tennessee Rule of Appellate Procedure 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016). Then, we make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). "The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV. DISCUSSION

### A. *Grounds for Termination*

### 1. Persistent Conditions

On appeal, Mother argues that DCS failed to prove the ground of persistent conditions by clear and convincing evidence. However, the trial court did not terminate Mother's parental rights on the ground of persistent conditions. In its amended order, the trial court found that DCS did *not* meet its burden of proving the ground of persistent conditions by clear and convincing evidence. And, DCS does not challenge this ruling on appeal.

In *Carrington*, the Tennessee Supreme Court granted review to decide "whether the Court of Appeals must review *any ground the trial court relied on to terminate parental rights* when a parent fails to raise all grounds for termination on appeal." 483 S.W.3d at 511 (emphasis added). The court held that "in an appeal from an order *terminating* parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether *the parent* challenges these findings on appeal." *Id.* at 525-26 (emphasis added). This review is intended to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures." *Id.* at 525. However, we do not interpret *Carrington* to mean that this Court must also review grounds that the trial court found were *not* sufficiently proven when the party who sought termination does not challenge that ruling on appeal. *See, e.g., In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 & n.5 (Tenn. Ct. App. July 23, 2018) (limiting review on appeal to "each ground for termination that the trial court found the Department established by clear and convincing evidence" but omitting analysis of another ground that the trial court found was not proven where DCS did not challenge that ruling on appeal); *In re Zayne P.*, No. W2017-

01590-COA-R3-PT, 2018 WL 2041573, at *6 (Tenn. Ct. App. Apr. 30, 2018) (concluding that "the mandate from *In re Carrington H.* to review all grounds on which termination of parental rights is based does not apply" and the Court of Appeals "need not consider the grounds that were not proven" when the trial court declines to terminate parental rights); *In re Addalyne S.*, No. M2017-00958-COA-R3-PT, 2018 WL 1976175, at *6 n.6 (Tenn. Ct. App. Apr. 26, 2018) *perm. app. denied* (Tenn. July 30, 2018) ("'The rule adopted in *Carrington* has never been construed to require this Court to also consider the grounds not sustained by the trial court' and not challenged on appeal by the [petitioner].") (quoting *In re Sydney B.*, 537 S.W.3d 452, 456 (Tenn. Ct. App. 2017) *perm. app. denied* (Tenn. Aug. 1, 2017)). Because the trial court found in favor of Mother on the ground of persistent conditions, and that ruling is not challenged on appeal, this Court is not required to review this ground for termination. *See In re Addalyne S.*, 2018 WL 1976175, at *6 n.6.

### 2. Substantial Noncompliance

The ground of substantial noncompliance presents a slightly different issue. The trial court *did* find that Mother's parental rights should be terminated based on the ground of substantial noncompliance. However, on appeal, DCS abandoned its pursuit of termination based on this statutory ground. Its brief on appeal states:

> The Department will not defend the ground of substantial non-compliance with the permanency plan, as [her case worker] acknowledged that Mother accomplished all she could on the first two plans during her eleven months in jail, and the third permanency plan, created less [than] two months after her release, required only that she participate in visitation and provide names of putative fathers—neither of which was related to remedying the drug abuse that necessitated Colton's placement in foster care[.]

Again, *Carrington* provides that "appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if *a parent* fails to challenge these findings on appeal" in order to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures." *In re Carrington H.*, 483 S.W.3d at 511, 525 (emphasis added). However, when the petitioner who sought termination has conceded on appeal that a ground was not sufficiently proven, this Court has, in several cases, reversed the trial court's finding as to that ground without reaching the merits of whether the ground was actually established.

For instance, when faced with the same situation in *In re Zane W.*, No. E2016-02224-COA-R3-PT, 2017 WL 2875924, at *7 (Tenn. Ct. App. July 6, 2017) *perm. app. denied* (Tenn. Sept. 26, 2017), this Court explained:

As an initial matter, we note that DCS, in the body of its brief, states that it "does not defend the ground of persistence of conditions ... but proceeds only the grounds of abandonment by wanton disregard and substantial noncompliance with the permanency plan" on appeal. Based upon DCS's concession, we need not tax the length of this Opinion with an analysis of whether the trial court was correct in terminating Mother's parental rights on the ground of persistence of conditions. *Cf. In re I.E.A.*, 511 S.W.3d 507, 514 (Tenn. Ct. App. 2016) (assuming that the trial court was not entitled to rely on the magistrate's previous finding of severe abuse in a dependency and neglect proceeding based on DCS's concession). Our decision does not run afoul of the Tennessee Supreme Court's decision in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), which ruled that this Court must consider all of the grounds found by the trial court, "regardless of whether the parent challenges these findings on appeal." *Id.* at 525-26. The policy behind this rule is to "ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures." *Id.* at 525. However, this rule has never been construed to require this Court to also consider the grounds sustained by the trial court and thereafter conceded or waived by the non-parent on appeal. Accordingly, we reverse the trial court's finding of the ground of persistence of conditions and will only consider the remaining grounds found by the trial court and appealed by Mother in this case.

*See also In re Nakayia S.*, No. M2017-01694-COA-R3-PT, 2018 WL 4462651, at *3 (Tenn. Ct. App. Sept. 18, 2018) (stating that DCS conceded two grounds on appeal and therefore the grounds were waived and summarily reversed); *In re Gabriel B.*, 2018 WL 3532078, at *4 n.6 ("On appeal, the Department elected not to defend the trial court's termination of Father's rights based on his failure to provide a suitable home . . . . As a result of the Department's position, we will not review the trial court's findings with respect to this ground, and we vacate the trial court's termination of Father's parental rights based on [this ground]."); *In re Jaylah W.*, 486 S.W.3d 537, 547 (Tenn. Ct. App. 2015) ("taking DCS's assertion as true that clear and convincing evidence did not exist as to these two grounds, we reverse the trial court's decision to terminate Mother's rights based on these grounds" without opining on the merits, as DCS abandoned the issues on appeal); *but see In re Hayden L.*, No. E2018-00147-COA-R3-PT, 2018 WL 4190986, at *5 (Tenn. Ct. App. Aug. 31, 2018) ("Despite DCS's choice not to defend the ground of abandonment by willful failure to support, [] this Court is charged to review each of the grounds the trial court relies on in terminating a parent's rights.")

Because of the position taken by DCS on appeal, we reverse the trial court's termination of parental rights on the ground of substantial noncompliance.

### 3. Severe Child Abuse

At the time of the proceedings below, Tennessee Code Annotated section 36-1-113(g)(4) provided that a ground for terminating parental rights existed if:

> The parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.][5]

We conclude that this ground for termination was proven by clear and convincing evidence.[6] While in the NICU, Colton was drug screened and tested positive for morphine, buprenorphine, meperidine, opioids, and benzodiazepines. The detective from the sheriff's department testified during his deposition that when he interviewed Mother days after Colton was born, she admitted to using morphine and Subutex by injection daily throughout her entire pregnancy. The investigator for Child Protective Services likewise testified that when she interviewed Mother after Colton's birth, Mother admitted to being an intravenous drug user for years and shooting up morphine the night before she went into labor. At trial, Mother conceded that she used drugs during her pregnancy, but she claimed that once she learned she was pregnant, she stopped using morphine and switched to Subutex. Still, Mother admitted that she did not have a prescription for Subutex, and she later admitted to taking morphine the night she went into labor because her back was hurting. Thus, the undisputed facts show that Mother engaged in illegal drug use during her pregnancy.

This particular ground for termination requires a finding of severe child abuse "as defined in § 37-1-102." Tenn. Code Ann. § 36-1-113(g)(4). Pursuant to that definition, severe child abuse includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death[.]" Tenn. Code Ann. § 37-1-102(b)(22)(A)(i). On appeal, Mother concedes that she used morphine and Subutex during her pregnancy. However, she insists that her actions did not constitute severe child abuse against Colton because he was a "fetus" at

---

[5] Effective July 1, 2018, the statute was amended to provide for termination based on a finding of severe child abuse against "any child," not just the child who is the subject of the petition, siblings, or other children in the home. *See* Tenn. Code Ann. § 36-1-113(g)(4) (2018).

[6] The juvenile court's prior finding of severe child abuse had been appealed at the time of the termination trial, and the resolution of that appeal is not clear from the record. As a result, we have not relied on the prior decision for purposes of determining whether severe child abuse occurred.

the time of her conduct, not a "child." Mother acknowledges that Tennessee appellate courts have repeatedly held that prenatal drug use qualifies as severe child abuse. Still, she insists that our courts have "played with some definitions and language and ultimately found a way to reach this conclusion" when it was not supported by public policy or fairness. Citing criminal and wrongful death cases, Mother urges this Court to overrule the line of termination cases "arbitrarily" holding that prenatal drug use constitutes severe child abuse for purposes of terminating parental rights.

For over a decade, this Court has held that prenatal drug use constitutes severe child abuse for purposes of terminating parental rights. *See In Matter of M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App. Apr. 14, 2005). In *In re Benjamin M.*, 310 S.W.3d 844, 846–51 (Tenn. Ct. App. 2009), we discussed the issue in great detail in light of a parent's argument that a "child" within the meaning of the statute "does not include a fetus." *Id.* at 847. We agreed with DCS that this argument "misses the point because the fetus did not stay a fetus but became a child that sustained injury at the hand of the Mother." *Id.* As a result, we concluded that a parent may be held responsible for prenatal conduct that exposes a child, once born, to great bodily harm. *Id.* We also considered the mother's arguments regarding whether a fetus is a child or a person within the meaning of criminal law and wrongful death actions but found that neither argument was helpful in a parental termination case. *Id.* at 849-50. We ultimately concluded that "the statutory language defining severe child abuse clearly reflects an intent that actions before a child is born can constitute abuse to a child that is born injured by those actions." *Id.* at 850. Consequently, "[w]hen a child is born alive but injured, the pre-birth timing of the actions is not dispositive." *Id.* at 850-51.

In numerous cases since *Benjamin M.*, this Court has repeatedly confirmed that severe child abuse can be based on a mother's prenatal drug use.[7] *See, e.g., In re P.T.F.*, No. E2016-01077-COA-R3-PT, 2017 WL 2536847, at *5 (Tenn. Ct. App. June 12, 2017) ("This Court has consistently upheld termination of a mother's parental rights on the ground of severe child abuse when she has used drugs during pregnancy."); *In re Garvin M.*, 2014 WL 1887334, at *5 ("there are numerous cases holding that a mother's use of drugs while pregnant can constitute severe child abuse"); *In re Shannon P.*, No. E2012-00445-COA-R3-PT, 2013 WL 3777174, at *5 (Tenn. Ct. App. July 16, 2013) *perm. app. denied* (Tenn. Oct. 16, 2013) ("there is substantial case law supporting a finding of severe child abuse for a parent exposing a child to drugs in utero"); *In re Ethin E.S.*, No. E2011-02478-COA-R3-PT, 2012 WL 1948817, at *8 (Tenn. Ct. App. May 31, 2012) ("this Court has repeatedly held that a mother's prenatal drug use can constitute severe child abuse in termination of parental rights cases"); *In re Joshua E.R.*, No. W2011-02127-

---

[7] Likewise, "a father may have his parental rights terminated based on the ground of severe child abuse for failing to take action to protect an unborn child from illicit drug use by the Mother during pregnancy." *In re Garvin M.*, No. E2013-02080-COA-R3-PT, 2014 WL 1887334, at *5 (Tenn. Ct. App. May 9, 2014).

COA-R3-PT, 2012 WL 1691620, at *3 (Tenn. Ct. App. May 15, 2012) ("In light of our prior holdings, and the supreme court and General Assembly's disinclination to overrule them, we continue to hold that prenatal drug abuse may constitute severe child abuse for the purpose of terminating parental rights."); *In re B.A.C.*, 317 S.W.3d 718, 725 (Tenn. Ct. App. 2009) ("we are content to rely on the reasoning set forth in . . . *In re Benjamin M.* . . . thoroughly addressing the question of whether prenatal drug use may constitute severe child abuse"). This long line of cases "demonstrate[s] the uniform view of this Court that prenatal drug use does, in fact, constitute severe child abuse." *In re P.T.F.*, 2017 WL 2536847, at *4. "A child has the right 'to begin life free from the impairment of drug addiction and other ill effects of prenatal drug abuse.'" *Id.* at *5 (quoting *In re Benjamin M.*, 310 S.W.3d at 849).

We continue to adhere to these holdings and reject Mother's assertion that she did not commit severe child abuse by exposing Colton to *prenatal* drug use. "[P]renatal abuse of controlled substances constitutes severe child abuse, whether or not the child actually suffers harm." *In re Shannon P.*, 2013 WL 3777174, at *5; *see* Tenn. Code Ann. § 37-1-102(b)(22)(A)(i) (referencing "abuse or neglect that is *likely* to cause serious bodily injury or death") (emphasis added). "[T]he healthy development of the child . . . does not diminish the severity of the harm to which the child was exposed." *In re M.J.J.*, 2005 WL 873305, at *8. Here, of course, Colton did experience significant harm due to Mother's drug use, necessitating intubation, suctioning, and ventilation to revive him at birth and care in the NICU for nearly a month thereafter. Colton's neonatologist testified that Mother's prenatal drug use placed him at an imminent risk of harm following birth, or even potential death. We affirm the trial court's conclusion that Mother engaged in severe child abuse against Colton.

The termination statute provides that termination of parental rights "may be based upon any of the grounds listed in [ ] subsection (g)." Tenn. Code Ann. § 36-1-113(g). In other words, "the existence of any one ground for termination is enough." *In re M.A.A.K.*, No. E2010-01318-COA-R3-PT, 2010 WL 4342154, at *4 (Tenn. Ct. App. Nov. 3, 2010). However, due to the supreme court's instruction in *Carrington*, we must also review the other ground that was at issue in this case.

### 4. Failure to Manifest an Ability and Willingness to Assume Custody or Financial Responsibility

Tennessee Code Annotated section 36-1-113(g)(14) provides that another ground for termination exists when:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the

physical or psychological welfare of the child.

This ground was added to the termination statute effective July 1, 2016. *See* 2016 Tenn. Laws Pub. Ch. 919. "Because of the relatively recent enactment of section 36-1-113(g)(14), few cases have considered this particular ground for termination of a legal parent's parental rights." *In re Isaiah B.*, No. E2017-01699-COA-R3-PT, 2018 WL 2113978, at *17 (Tenn. Ct. App. May 8, 2018).

This ground for termination requires the petitioner to prove two elements by clear and convincing evidence. *In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *7 (Tenn. Ct. App. Apr. 4, 2018). First, the petitioner must prove that the parent has failed to manifest "an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14). Second, the petitioner must prove that placing the child in the parent's custody "would pose a risk of substantial harm to the physical or psychological welfare of the child." *Id.*

Currently, a "split in authority exists" as to how the first element must be proven. *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *12 (Tenn. Ct. App. June 20, 2018). In *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at *7 (Tenn. Ct. App. May 31, 2018), a panel of this Court concluded that the first prong of the statute requires the petitioner to prove both an inability *and* an unwillingness of the parent to assume custody or financial responsibility for the child. In that case, DCS argued that "it only had to prove an inability *or* unwillingness" of the parent to assume custody (or financial responsibility). *Id.* This Court declined to adopt DCS's interpretation and concluded that this ground for termination was not sufficiently proven where the juvenile court found that the parents at issue "definitely want[ed]" custody and were "willing to assume" financial responsibility, which "negated a required element of the statutory ground." *Id.*

Another panel of this Court "respectfully disagree[d]" with the *Ayden S.* decision in *In re Amynn K.*, 2018 WL 3058280, at *13. Analyzing each phrase of the statute, the Court explained that "the petitioner must prove the legal parent or guardian's failure to do something" -- specifically, the parent's failure "to satisfy a conjunctive basic requirement." *Id.* at *13. That basic requirement was that "the parent must have 'manifest[ed], by act or omission, an ability <u>and</u> willingness.'" *Id.* (quoting Tenn. Code Ann. § 36-1-113(g)(14)). The *Amynn K.* Court held:

> [T]he first prong of Tennessee Code Annotated § 36-1-113(g)(14) requires that the petitioner prove that a parent has failed to meet the requirement of manifesting both a willingness and an ability to assume legal and physical custody of the child or has failed to meet the requirement of manifesting both a willingness and an ability to assume financial responsibility of the

- 13 -

child.

*Id.* at *14. Thus, the *Amynn K.* Court concluded that subsection (g)(14) permits termination of parental rights if a parent has manifested a willingness but not an ability to assume custody or responsibility for the child. *See id.*

In Colton's case, it is not necessary to adopt one approach over the other because, under either approach, this ground for termination was met. In other words, this is not a case where a parent manifested a willingness to assume custody and financial responsibility but was simply unable to do so. Mother manifested neither the ability nor the willingness to assume custody or financial responsibility of Colton. Again, the statute requires us to consider whether the parent "has failed *to manifest, by act or omission*, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child." Tenn. Code Ann. § 36-1-113(g)(14) (emphasis added). "[T]he parent's willingness and ability may be manifested through either an 'act' or an 'omission.'" *In re Isaiah B.*, 2018 WL 2113978, at *18; *see, e.g.*, *In re Maya R.*, 2018 WL 1629930, at *7 ("Mother failed to manifest a willingness to personally assume legal and physical custody of the children: she completed virtually nothing required by the permanency plan until after the termination petition was filed."). A mere subjective claim of willingness is insufficient. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) ("Although Mother testified that she was both willing and able, her actions proved otherwise."); *In re M.E.N.J.*, No. E2017-01074-COA-R3-PT, 2017 WL 6603658, at *6-7 (Tenn. Ct. App. Dec. 27, 2017) (acknowledging that a mother seemed to love her children and desired to see them during visits but concluding that she failed to manifest a willingness to assume custody by refusing assistance from DCS).

Mother has failed to manifest an *ability* to assume custody of Colton due to her unresolved issues with a longstanding drug addiction and unstable housing and employment. She has further failed to manifest a *willingness* to assume custody by failing to take the steps necessary to resolve these issues and by generally demonstrating a lack of interest in actually obtaining custody of Colton. At trial, Mother's case worker opined that Mother's actions throughout the case did not indicate, to her, "a willingness to take Colton for herself," but rather, a desire for Colton to be placed with Grandmother, just like Mother's older child.[8] The case worker testified that when the issue of custody was discussed, Mother repeatedly told her that Colton should be placed with Grandmother, or "family," but she never specifically said that she wanted custody herself. Even at trial, when Mother was asked how she felt about either Grandmother

---

[8] Mother had reflected the same ambivalent attitude about her older child. When Grandmother was asked at trial about why Mother had not attempted to regain custody of the older child, Grandmother testified, "She never said anything about wanting her or not wanting her. She was just in agreeance, as far as I know, with me having her."

- 14 -

adopting Colton or adopting Colton herself, Mother replied, "Either way it goes, I'm fine with it." Overall, her acts and omissions throughout this case have failed to demonstrate a "willingness to personally assume legal and physical custody . . . of the child." Tenn. Code Ann. § 36-1-113(g)(14). Likewise, Mother failed to manifest an ability or willingness to assume financial responsibility for Colton, providing only one $100 child support payment for him over the course of nearly two years and securing stable employment just a couple of weeks before the termination trial.

As for the second prong, we conclude that placing custody of Colton with Mother "would pose a risk of substantial harm to the physical or psychological welfare of the child." Tenn. Code Ann. § 36-1-113(g)(14). This element requires "'a real hazard or danger that is not minor, trivial, or insignificant,'" and although "'the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.'" *In re Maya R.*, 2018 WL 1629930, at *8 (quoting *Ray v. Ray,* 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)). Mother began attending supervised visits with Colton twice a month after she was released from incarceration, but placing Colton in Mother's custody would likely result in additional drug exposure and instability. Colton's neonatologist testified that "probably the most important thing that you can do for these children, is put them in a home where they are loved, nurtured, and supported, in an environment with a sober [] provider." It is unlikely that Mother would be able to fulfill that role. At the same time, Colton's doctors have determined that he is making "excellent progress while in [Foster Mother's] care" and that he is "fortunate to have such a loving and committed foster family caring for him."

For the aforementioned reasons, we conclude that this ground for termination was also proven by clear and convincing evidence.

## B. Best Interest

Because the trial court properly found at least one ground for termination, we must review the trial court's finding that termination of parental rights is in the best interest of Colton. The Tennessee Supreme Court recently discussed the best interest analysis as follows:

> When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that

- 15 -

termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

Ascertaining a child's best interests involves more than a rote examination of the statutory factors. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. Depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis. But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017) (citations and quotations omitted).

Here, the trial court made extensive findings regarding every one of the statutory factors. The trial court found no reasonable likelihood that Mother would adjust her circumstances to enable Colton to be returned to her home because she still had not exhibited sufficient efforts to address the concerns that led to him being removed from her custody nearly two years before trial. The trial court found that Mother's failed drug screens during this case indicated that she continued to use illegal and non-prescribed substances, rendering her unable to provide a safe and stable environment for Colton. The trial court found that "despite the best efforts of DCS to provide services to her,"[9]

---

[9] As a separate issue, Mother contends that the evidence does not support the trial court's finding that DCS made reasonable efforts to assist her. "[I]n a termination proceeding, the extent of DCS's efforts to reunify the family is weighed in the court's best-interest analysis, but proof of reasonable efforts is not a precondition to termination of the parental rights of the respondent parent." *In re Kaliyah S.*, 455 S.W.3d at 555. Here, the trial court found that DCS made reasonable efforts to assist Mother (even though it was relieved of its obligation to make

Mother avoided DCS drug screens whenever possible and did not consistently attend the aftercare programs recommended to address her substance abuse. It found that she did not have a home of her own but lived with a friend who might not welcome Colton into the home, and Mother had a history of "persistent unemployment." While Mother was paying her own legal fees, she had only paid $100 in child support in almost two years.

The trial court found that Mother attended supervised visits with Colton regularly and that her time with Colton was "not negative" but that she permitted other family members to visit with him for the last 30 minutes of each visit and had not established a meaningful relationship with him. The trial court also credited the testimony of Colton's neonatologist about the need for a stable environment and a sober provider. The court noted that Foster Mother's home is the only home that Colton has ever known, that he refers to Foster Mother as "Momma," and that he has bonded with Foster Mother's parents and her two daughters. The court found that Foster Mother ensured Colton received all services and resources available from Vanderbilt and DCS to monitor his development and that he was "thriving in his current placement." It found that placing Colton with Mother would negatively impact his emotional and psychological well-being and be contrary to his best interest. It also noted that Mother had committed severe child abuse against Colton by using drugs while she was pregnant, placing him at an imminent risk of harm. The court concluded that Mother "is not capable of effectively providing safe and stable care and supervision" for Colton. The evidence does not preponderate against the trial court's factual findings, and we conclude that the combined weight of the evidence clearly and convincingly establishes that termination of Mother's parental rights is in Colton's best interest.

## C. Conflict of Interest

Finally, Mother argues that "conflicts of interest between [Mother], [Foster Mother], and the Department of Children's Services resulted in prejudice against [Mother] in the handling of this case." As support for this assertion, Mother notes that Foster Mother had served as Mother's probation officer in the past. The record before us contains a "Violation of Probation" affidavit signed by Foster Mother *from December 2012* indicating that Mother had previously been convicted of reckless endangerment and possession of drug paraphernalia and that the court suspended her sentence and placed her on probation. The affidavit states that Mother had violated the conditions of her probation by failing to report to her probation officer since October 2012, failing to maintain her court cost payments, and failing to pay her probation fees. Mother was admittedly "on the run" for the next three years. When Foster Mother learned that her brother was the putative father of Mother's unborn child, she "passed the case off" to another probation officer before the child was born. It was not until after Colton's birth

reasonable efforts pursuant to the juvenile court's order in April 2016). The evidence supports the trial court's conclusion that DCS made reasonable efforts.

in 2015 that Mother was arrested and a judge ordered her to serve her original sentence. And, it was not until after Colton's birth that Grandmother indicated she was unwilling to raise Colton, and he was placed with Foster Mother in what was believed to be a relative placement. The record contains no indication that Mother ever argued that this constituted a "conflict of interest," either at the time of placement or during the termination trial.

On appeal, Mother argues, for the first time, that this alleged "conflict of interest" prejudiced her because Foster Mother "would have had access to confidential information regarding [Mother] and her history," and "as a probation officer, [Foster Mother] would have had regular contact with DCS although the extent of her relationship with DCS is not contained in the record." Mother also suggests that "the probation officer could have got the probation reinstated after several months thus allowing [Mother] to be released from jail early," but it is not clear from this argument whether Mother is criticizing her new probation officer or Foster Mother for relinquishing the case.

We conclude that Mother waived any argument regarding an alleged conflict of interest by raising it for the first time on appeal. *See Black v. Blount*, 938 S.W.2d 394, 403 (Tenn. 1996) ("Under Tennessee law, issues raised for the first time on appeal are waived.") Even if we considered the issue, though, we would conclude that it had no merit. *See In re S.M.R.*, No. M2008-01221-COA-R3-PT, 2008 WL 4949236, at *13 (Tenn. Ct. App. Nov. 18, 2008) (finding no merit in a mother's "unsubstantiated contention that she was prejudiced due to [an] alleged conflict of interest" from a foster parent being employed by DCS). The record contains no evidence that Foster Mother's former role as Mother's probation officer impacted this case in any way or resulted in prejudice to Mother. For instance, Mother claims that prejudice was demonstrated when DCS left Colton with Foster Mother even after a DNA test revealed she was unrelated, rather than placing the child with Grandmother. However, the juvenile court considered and rejected Grandmother's intervening petition for custody, not DCS. We find no merit in this issue.

## V.   CONCLUSION

For the aforementioned reasons, the decision of the juvenile court is reversed in part, affirmed in part, and remanded for further proceedings. The termination of Mother's parental rights is affirmed. Costs of this appeal are taxed to the appellant, Miranda H., for which execution may issue if necessary.

_____
BRANDON O. GIBSON, JUDGE