FILED

08/02/2019

Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 3, 2019

IN RE K.S.

**Appeal from the Juvenile Court for Knox County**
**No. 171528            Timothy E. Irwin, Judge**

_____

**No. E2018-02274-COA-R3-PT**

_____

The Department of Children's Services filed a petition to terminate the parental rights of S.M. (mother) with respect to her child, K.S.[1] The trial court determined that clear and convincing evidence supported multiple grounds for terminating mother's parental rights. By the same quantum of proof, the court determined that termination is in the best interest of the child. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which ANDY D. BENNETT and CARMA DENNIS MCGEE, JJ., joined.

Gregory E. Bennett, Seymour, Tennessee, for the appellant, S.M.

Herbert H. Slatery, III, Attorney General and Reporter, and Erin A. Shackelford, Assistant Attorney General, Nashville, Tennessee, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**I.**

On October 9, 2018, DCS filed a petition to terminate mother's parental rights. Mother did not respond to the petition. Consequently, DCS filed a motion for a default judgment. On November 27, 2018, the trial court held a hearing on DCS's motion. Mother did not attend. The court heard testimony from the child's DCS case manager and the child's foster mother. The child's guardian ad litem was also present. After the

---

[1] DCS filed a separate petition to terminate the parental rights of M.S. (father). The trial court terminated father's rights in a separate order. That order is not a subject of this appeal.

hearing, the court entered a default judgment terminating mother's parental rights. We restate the court's findings of fact verbatim, with paragraph numbering omitted:

> [K.S.] was born out of wedlock to [S.M.] and [M.S.] on November 2, 2017, in Knox County, Tennessee. The temporary custody of [K.S.] was awarded to the State of Tennessee, Department of Children's Services, on November 6, 201[7], by order of the Juvenile Court of Knox County, Tennessee; he has been in foster care continuously since that date. The termination petition was filed against Respondent on October 9, 2018.
>
> This child was removed from Respondent and the father due to their drug use during Respondent's pregnancy. Respondent learned she was pregnant in March of 2017 via a home pregnancy test. She and the father were living in Florence, Alabama at the time. She attended a single prenatal appointment each month in May, June, July, and August, 2017. Respondent told the Department's investigator that her doctor in Alabama spoke to her about the risks of her continued opiate use and told her that these risks included Neonatal Abstinence Syndrome, Sudden Infant Death Syndrome, and birth defects.
>
> At Respondent's May, 2017 prenatal appointment, which took place on May 11, 2017, she tested positive for marijuana, benzodiazepine, and oxycodone. She admitted to using marijuana a week prior. In June, 2017, Respondent was thirty minutes late for her prenatal appointment. She appeared with a black eye. She explained that her boyfriend got drunk the night before and threw her phone at her and this caused the injury. Respondent said the father was supposed to come get her and bring her to her appointment, but he didn't show up because he didn't want medical personnel to see her face. The father later appeared at the doctor's office, asking to see Respondent, but left when he wasn't given access to her. She stayed with him.
>
> By July 2017, Respondent told staff at her OB/GYN's office that she was moving to Huntsville, Alabama with Respondent and in August, 2017 they were residing there together. In September of 2017, Respondent and the father moved to Knoxville after being kicked out of the father's mother's

home. During the same month, Respondent failed a drug screen for opiates and THC at her new OB/GYN's office. Following the child's birth, Respondent admitted to taking Norco 10 mg daily during her pregnancy but then altered her admission to say she did not take them every day but that she "just popped them." Respondent has two older children, neither of whom is in her legal or physical custody. Custody of this child was given to the Department on November 6, 2017.

The initial permanency plan for this child was developed at a Child & Family Team Meeting on November 28, 2017, with Respondent's presence and participation. Among other things, the plan required that she:

> a. complete an alcohol and drug assessment, openly and honestly disclose h[er] history of substance use, follow any resulting recommendations until successfully completed, refrain from associating with drug users or dealers, and pass random drug screens to demonstrate sobriety;

> b. complete a mental health assessment and follow resulting recommendations; and

> c. obtain and maintain safe, suitable housing free from environmental hazards, domestic violence, drug abuse or other risks to the child.

She was also expected to visit regularly, to have a stable source of legal income and pay child support, to be law-abiding, and to maintain contact with the child's case manager.

Respondent initially told the child's case manager that she had insurance and would use this to obtain her assessments. In December of 2017, Respondent informed the child's case manager that she could not afford to complete a mental health assessment or alcohol and drug assessment. The child's case manager requested funding for Respondent's assessments on December 13, 2017 and received approval. On January 6, 2018, the child's case manager discovered that Respondent

and the father failed to appear for their assessments and did not return attempted phone calls from Omni Community Health. The child's case manager asked Respondent about the assessments and reminded her of their importance on January 25, 2018 and February 2, 2018.

Respondent finally completed a drug and alcohol assessment and mental health assessment at Omni Community Health on February 24, 2018. She admitted to the assessor that she has used marijuana consistently since age fifteen and has used opiates and depressants off and on since age nineteen. Respondent described periods when she did not use opiates or depressants followed by periods of relapse, either because substances were available to her or because she had an emotional need for the drugs. In Alabama, she attended IOP, but did not complete it. She admitted she last used opiates and depressants two to three days prior to the assessment and marijuana and alcohol the day before the assessment.

Respondent also discussed a history of mental health issues: she was diagnosed with depression as a teen and prescribed Selexa. Respondent said that she still has symptoms of depression and feels panic and lack of control in situations. She acknowledged her emotional issues are a factor in her drug dependency and that she has a substance abuse disorder. At the conclusion of the assessment, the assessor recommended that Respondent attend individual therapy to address emotional needs, relapse prevention, and increased selfesteem [sic]. Medication management was also recommended. If continued substance use occurs, the assessor opined, Respondent's admission into an IOP program would be the next logical step. The assessor noted that Respondent expressed willingness and openness to treatment and a desire to attend therapy and get on appropriate medication. However, Respondent also appeared very focused on ensuring she and the father of the child could do everything together.

Respondent reported to her assessor that she had insurance through her father and would check on coverage for therapeutic services, but more than seven months later, she has not even begun the recommended services. Her drug use continues. On April 5, 2018, Respondent tested positive for

THC on a hair follicle drug screen. She was positive for heroin and morphine on a standard drug screen given on May 10, 2018, the same substances that the father tested positive for on his next drug screen. Respondent never responded to a request for a drug screen on August 23, 2018.

Respondent's current relationship with the father and her living situation are unclear. She told the child's case manager that she and the child's father rented an apartment with the assistance of his family, but most recently reported that she plans to break up with him because he is abusive. Respondent's communication with the child's case manager and her visitation with the child became sporadic in the months before the termination petition was filed. She did not visit in August or September, 2018, but resumed visitation after she was served with the termination petition.

The court determined that these findings of fact clearly and convincingly supported six grounds for terminating mother's parental rights. By the same quantum of proof, the court determined that termination of mother's rights was in the best interest of the child. Mother timely appealed.

## II.

Mother raises the following issues, which we have slightly restated:

Whether the trial court erred by finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by failure to support.

Whether the trial court erred by finding clear and convincing evidence to terminate mother's parental rights on the ground of abandonment by failure to provide a suitable home.

Whether the trial court erred by finding clear and convincing evidence to terminate mother's parental rights on the ground of persistent conditions.

Whether the trial court erred by finding clear and convincing evidence to terminate mother's parental rights on the ground of severe child abuse.

Whether the trial court erred by finding clear and convincing

evidence to terminate mother's parental rights on the ground of substantial noncompliance with the permanency plan.

Whether the trial court erred by finding clear and convincing evidence to terminate mother's parental rights on the ground of failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child.

Whether the trial court erred by finding clear and convincing evidence that termination of mother's parental rights is in the best interest of the child.

## III.

A parent has a fundamental right, based on both the federal and state constitutions, to the care, custody, and control of his or her child. *Stanley v. Ill.*, 405 U.S. 645, 651 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *Nash–Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn. 1996). Although this right is fundamental, it is not absolute. The State may interfere with a parent's rights in certain circumstances. *In re Angela E.*, 303 S.W.3d at 250. Our legislature has listed the grounds upon which termination proceedings may be brought. Tenn. Code Ann. § 36-1-113(g) (Supp. 2018) (amended 2019). Because termination proceedings are statutory, *In re Angela E.*, 303 S.W.3d at 250; *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004), a parent's rights may be terminated only where a statutory basis exists. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In the Matter of M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).

To terminate parental rights, a court must determine by clear and convincing evidence the existence of at least one of the statutory grounds for termination and that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010) (citations omitted). Unlike the preponderance of the evidence standard, "[e]vidence satisfying the clear and convincing standard establishes that the truth of the facts asserted is highly probable." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005).

Once a ground for termination is established by clear and convincing evidence, the trial court conducts a best interest analysis. *In re Angela E.*, 303 S.W.3d at 251 (citing *In re Marr*, 194 S.W.3d 490, 498 (Tenn. Ct. App. 2005)). "The best interest[ ] analysis is separate from and subsequent to the determination that there is clear and convincing

evidence of grounds for termination." *Id.* at 254. The existence of a ground for termination "does not inexorably lead to the conclusion that termination of a parent's rights is in the best interest of the child." *In re C.B.W.*, No. M2005-01817-COA-R3-PT, 2006 WL 1749534, at *6 (Tenn. Ct. App., filed June 26, 2006).

We are required to review all of the trial court's findings with respect to grounds and best interest. *In re Carrington*, 483 S.W.3d 507, 525-26 (Tenn. 2016) ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interest[ ], regardless of whether the parent challenges these findings on appeal.").

The Tennessee Supreme Court has stated our standard of review:

> An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness.

*Id.* at 523-24 (internal citations omitted). "When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to . . . the trial court's factual findings." *In re Adoption of S.T.D.*, No. E2007-01240-COA-R3-PT, 2007 WL 3171034, at *4 (Tenn. Ct. App., filed Oct. 30, 2007) (citing *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999)).

## IV.

The trial court identified six grounds for terminating mother's parental rights: (A)

abandonment by failure to support; (B) abandonment by failure to provide a suitable home; (C) persistent conditions; (D) severe child abuse; (E) substantial noncompliance with the permanency plan; and (F) failure to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child. We discuss each ground in turn.

### A.

Tenn. Code Ann. § 36-1-113(g)(1) provides for the termination of parental rights on the ground of abandonment. A parent abandons a child when,

> [f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent . . . the parent . . . ha[s] failed to support or ha[s] failed to make reasonable payments toward the support of the child[.]

*Id.* at § 36-1-102(1)(A)(i).

> [I]t shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. . . .

*Id.* at § 36-1-102(1)(I) (effective July 1, 2018).[2]

We agree with the trial court that undisputed evidence in the record clearly and convincingly supports termination of mother's parental rights on the ground of abandonment for failure to support. The relevant four-month period is June 9, 2018, to October 8, 2018. *See In re Jacob C.H.*, No. E2013–00587–COA–R3–PT, 2014 WL 689085, at *6 (Tenn. Ct. App., filed Feb. 20, 2014) (holding "that the applicable four month window . . . includes the four months preceding the day the petition to terminate parental rights is filed but excludes the day the petition is filed."). The permanency plan required mother to pay forty dollars per month in child support. At trial, the DCS case manager testified that mother failed to make a single child support payment. Mother did not attend the termination hearing. As a result, mother did not carry her "burden of proof that the failure to . . . support was not willful." Tenn. Code Ann. § 36-1-102(1)(I).

---

[2] The recent statutory amendment is applicable in this case because DCS filed the petition to terminate mother's parental rights on October 9, 2018.

Mother argues that this evidence is not clear and convincing because the trial court relied upon evidence that should have been excluded as inadmissible. DCS correctly observes, however, that failure to make evidentiary objections at trial results in waiver of the issue on appeal. ***Robertson v. Tennessee Bd. of Social Worker Certification and Licensure***, 227 S.W.3d 7, 9 (Tenn. 2007). By failing to attend the termination hearing, mother waived all evidentiary objections. The court properly determined that the undisputed evidence in the record clearly and convincingly supports termination on this ground.

**B.**

A parent also abandons a child when,

> (a) The child has been removed from the home or the physical or legal custody of a parent . . . by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department . . . ;
>
> (b) The juvenile court found . . . that the department . . . made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
>
> (c) For a period of four (4) months following the physical removal, the department . . . made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . ha[s] not made reciprocal reasonable efforts to provide a suitable home and ha[s] demonstrated a lack of concern for the child to such a degree that it appears unlikely that [the parent] will be able to provide a suitable home for the child at an early date. The efforts of the department . . . to assist a parent . . . in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii).

We agree with the trial court that undisputed evidence in the record clearly and convincingly supports termination of mother's parental rights on the ground of

abandonment by failure to provide a suitable home. On November 7, 2017, DCS filed a petition alleging that the child was dependent and neglected. According to the petition, a DCS official "spoke with both parents about possible placements for the child." The only placement suggested by the parents was the paternal grandfather's girlfriend. However, DCS "could not approve her placement due to multiple DUI arrests." In light of these allegations, the trial court entered an order granting DCS temporary legal custody, effective November 6, 2017. The court appropriately found that DCS "made reasonable efforts to prevent removal of the child[.]" *Id.* at § 36-1-102(1)(A)(ii)(b). Given the urgent need to protect K.S. from his drug-abusing parents, "the circumstances of the child's situation" prevented DCS from engaging in additional reasonable efforts to prevent the child's removal. *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(b).

During a four-month period following the child's removal, DCS made reasonable efforts to assist mother in obtaining suitable housing. Consider, for example, the four-month period from December 2017 to March 2018. *But see In re T.R.*, No. E2017-02115-COA-R3-PT, 2018 WL 4441359, at \*7 (Tenn. Ct. App., filed Sept. 17, 2018) (quoting *In re Jakob O.*, No. M2016–00391–COA–R3–PT, 2016 WL 7243674, at \*13 (Tenn. Ct. App., filed Sept. 20, 2016) (noting that the statute "does not limit the window during which DCS may satisfy its obligation to make reasonable efforts to the four-month period directly following statutory removal.")). DCS scheduled and offered to secure financing for mother's A&D assessments, reminded mother of appointments when mother failed to attend, referred services to mother, administered drug screens, etc. We have consistently held that these types of actions constitute reasonable efforts to assist a parent in establishing a suitable home. *Id.* (citing *In re Nevada N.*, 498 S.W.3d 579, 596 (Tenn. Ct. App. 2016) (holding that DCS made reasonable efforts to assist mother in establishing a suitable home by performing multiple drug screens, maintaining consistent communication with mother, and coordinating her alcohol and drug assessments)).

At the very least, DCS's efforts "equal or exceed the efforts of [mother.]" *See* Tenn. Code Ann. § 36-1-102(1)(A)(ii)(c). During the same four-month period, mother missed multiple appointments, failed drug screens, failed to start therapy, and continued to live with father despite a history of substance abuse and domestic violence. *Cf. In re Hannah H.*, No. E2013–01211–COA–R3–PT, 2014 WL 2587397, at \*9 (Tenn. Ct. App., filed June 10, 2014) (quoting *State v. C. W.*, No. E2007–00561–COA–R3–PT, 2007 WL 4207941, at \*3 (Tenn. Ct. App. Nov. 29, 2007) ("A 'suitable home requires more than a proper physical living location.' It requires that the home be free of drugs and domestic violence.")). Accordingly, the trial court properly ruled that clear and convincing evidence exists to terminate mother's parental rights on this ground.

## C.

The trial court also found clear and convincing evidence to terminate mother's parental rights on the ground of persistent conditions. This ground is triggered when:

- 10 -

The child has been removed from the home or the physical or legal custody of a parent . . . for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent. . . , or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent . . . ;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3)(A).

We agree with the trial court that undisputed evidence in the record clearly and convincingly supports this ground for termination. The child was removed from mother's custody primarily because of mother's drug use. Six months after the child's removal, mother continued to use illegal drugs. For example, on May 10, 2018, mother tested positive for heroin and morphine. Mother did not attend a drug test scheduled for August 23, 2018. On November 14, 2018, shortly before the termination hearing, mother tested positive for amphetamines, cocaine, methamphetamine, methadone, and opiates.

Given mother's consistent drug use, failure to follow treatment recommendations, and other acts of noncompliance with the permanency plan, it is unlikely that mother will resolve her drug issues "at an early date so that the child can be safely returned to [mother] in the near future." Tenn. Code Ann. § 36-1-113(g)(3)(A)(ii). Continuation of the parent-child relationship also "greatly diminishes the child's chances of early integration into a safe, stable, and permanent home." *Id.* at § 36-1-113(g)(3)(A)(iii). The child has lived with his foster parents since birth. He has developed an emotional bond with the foster parents and their church community. The foster parents want to adopt the child but cannot do so until mother's parental rights are terminated. Accordingly, the trial court properly concluded that the undisputed evidence in the record clearly and convincingly supports termination of mother's parental rights on this ground.

- 11 -

**D.**

The trial court also found clear and convincing evidence to terminate mother's parental rights on the ground of severe child abuse. *See* Tenn. Code Ann. § 36-1-113(g)(4). "Severe child abuse" is defined, in relevant part, as

> (A)(i) [t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death . . . .

Tenn. Code Ann. § 37-1-102(27).

Mother admitted on multiple occasions that she used illegal drugs during her pregnancy, even though she knew she was pregnant. Nevertheless, mother argues that DCS failed to present clear and convincing evidence that mother committed severe child abuse because mother "was somehow able to shut it down and gave birth to a non-NAS child and the child doesn't seem to be suffering from NAS effects."

This Court has repeatedly held that "prenatal abuse of controlled substances constitutes severe child abuse, whether or not the child actually suffers harm." *In re Colton B.*, No. M2018-01053-COA-R3-PT, 2018 WL 5415921, at *8 (Tenn. Ct. App., filed Oct. 29, 2018) (quoting *In re Shannon P.*, No. E2012–00445–COA–R3–PT, 2013 WL 3777174, at *5 (Tenn. Ct. App., filed July 16, 2013)), *perm. app. denied* (Tenn. Jan. 22, 2019); *In re Benjamin M.*, 310 S.W.3d 844, 848 (Tenn. Ct. App. 2009), *perm. app. denied* (Tenn. 2010) ("severe child abuse can result from prenatal drug use"); *In Matter of M.J.J.*, No. M2004-02759-COA-R3-PT, 2005 WL 873305, at *8 (Tenn. Ct. App., filed Apr. 14, 2005) (holding that "the healthy development of the child in this case does not diminish the severity of the harm to which the child was exposed"). In light of our prior interpretations of Tenn. Code Ann. § 37-1-102(27), we reject mother's argument that DCS failed to present clear and convincing evidence of severe child abuse.

**E.**

The trial court also determined that clear and convincing evidence supported the termination of mother's parental rights on the ground that she substantially failed to comply with the permanency plan. *See* Tenn. Code Ann. § 36-1-113(g)(2).

As an initial matter, it is unclear whether DCS complied with its statutory obligation to prepare a permanency plan within thirty days of the child's foster care

placement. *See* Tenn. Code Ann. § 37-2-403(a)(1)(A).[3] On the other hand, it *is* clear that the trial court failed to ratify the plan within sixty days, as required by Tenn. Code Ann. § 37-2-403(a)(2)(A). The court ratified the plan on September 4, 2018, *ten months* after the child entered DCS custody. We take this opportunity to remind DCS and trial courts that they have a statutory duty to prepare and ratify permanency plans in a timely fashion. However, "we do not believe that failure to follow the prescribed time line is grounds for nullifying the permanency plan[,]" because "these requirements are directory and not mandatory." **In re A.W.**, 114 S.W.3d 541, 546 (Tenn. Ct. App. 2003); **In re T.F.**, No. W2001-01935-COA-R3-JV, 2002 WL 1751221, at *7 (Tenn. Ct. App., filed Feb. 19, 2002); *see also* **In re Destiny S.**, No. M2016-00098-COA-R3-PT, 2016 WL 4186731, at *6-7 (Tenn. Ct. App., filed Aug. 4, 2016) (holding that a court's ratification of the initial permanency plan ten months after the child was placed into foster care was not reversible error). Accordingly, we proceed to consider whether mother failed to substantially comply with the permanency plan.

The statement of responsibilities in the permanency plan contains a long list of desired outcomes and specific action steps that mother needed to complete. Among other things, the plan required mother to: obtain and maintain a legal source of income, complete mental health assessments, complete A&D assessments, follow all recommendations, cooperate with DCS home visits, pay forty dollars per month in child support, comply with all court orders, maintain contact with the DCS case manager at least twice a month, compete non-offending domestic violence parenting classes or a support group, ensure that there will be nobody living in the home that would be abusive to her or her child in any way, obtain and maintain appropriate housing, stop abusing alcohol and drugs, provide verification of participation in AA/NA meetings, and demonstrate sobriety by submitting to random hair follicle and/or urine drug screens and passing them.

"First, we ask whether the terms of the permanency plan are 'reasonable and related to remedying the conditions which necessitate foster care placement.' " **In re J.T. et al.**, No. M2017–01509–COA–R3–PT, 2018 WL 2148450, at *4 (Tenn. Ct. App., filed May 10, 2018) (quoting **In re Valentine**, 79 S.W.3d 539, 547 (Tenn. 2002)). This requirement is easily satisfied and mother makes no argument to the contrary. The child was removed from the mother's custody primarily because of mother's prenatal drug use and her exposure to domestic violence. Most of the action steps identified in the plan's statement of responsibilities directly relate to remedying mother's drug addiction and her association with her abusive boyfriend.

---

[3] The child entered DCS custody on November 6, 2017. The permanency plan contains a "Plan Date" of March 8, 2018. Mother signed the plan on March 28, 2018. Neither party argues that the plan entered into evidence is a revised version of the original plan; however, there are some indications that the plan may have been prepared prior to March 2018. For example, one "action step" in the plan's statement of responsibilities required mother to "complete a mental health assessment by 01/28/2018."

- 13 -

"Second, we ask whether a 'parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met.' " *Id.* at \*4 (quoting *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004)). Mother identifies the various ways in which she complied with aspects of the permanency plan. For example, she asked DCS for financial assistance so that she could complete certain assessments. Mother also completed a drug screening and mental health assessment at Omni Community Health. The assessor noted that mother expressed a willingness to attend therapy. In April 2018, mother also began renting a condominium from a family member at a reduced rate.

Nevertheless, DCS argues that mother was substantially noncompliant because she failed to effectively address her substance abuse issues and failed to complete the majority of her responsibilities set forth in the permanency plan. We agree. As the trial court noted in its order, mother continued to test positive for illegal drugs throughout the pendency of this case. The action steps relating to mother's drug use were of particular importance given the conditions that led to the child's removal. The degree of mother's noncompliance with other requirements was also substantial. For example, mother failed to complete the recommended IOP or counseling sessions designed to address her depression, which fuels her drug addiction. Mother's visitation with the child became progressively sporadic in the months leading to the filing of the termination petition. Mother failed to pay any child support. Finally, mother's relationship with father and her living situation remain unclear.

In light of the foregoing, the trial court properly determined that clear and convincing evidence supports termination of mother's parental rights on the ground of substantial noncompliance with the permanency plan.

### F.

Finally, the trial court found grounds to terminate mother's parental rights because there was clear and convincing evidence that mother

> failed to manifest, by act or omission, an ability and
> willingness to personally assume legal and physical custody
> or financial responsibility of the child, and placing the child
> in the [mother's] legal and physical custody would pose a risk
> of substantial harm to the physical or psychological welfare
> of the child[.]

Tenn. Code Ann. § 36-1-113(g)(14).

Mother argues that DCS failed to present clear and convincing evidence to support this ground for termination. She emphasizes that DCS must present evidence that mother

- 14 -

"failed to manifest . . . an ability *and* willingness to personally assume legal and physical custody or financial responsibility of the child[.]" *Id.* (emphasis added); *cf. In re Ayden S. et al.*, No. M2017–01185–COA–R3–PT, 2018 WL 2447044 (Tenn. Ct. App., filed May 31, 2018) (interpreting this statute conjunctively rather than disjunctively). Mother does not appear to dispute her present *inability* to properly parent the child; instead, mother focuses on her *willingness* to do so. In support of her position, mother highlights her initial compliance with the permanency plan. She also points to an assessor's observation that mother seemed willing to attend therapy.

Contrary to mother's assertions, undisputed evidence in the record clearly and convincingly supports termination of mother's rights on this ground. Mother's present inability to assume custody of the child is apparent. She continues to abuse illegal drugs; she has failed to take meaningful steps to address the mental health issues that fuel her drug addiction; and the uncertain status of her relationship with her abusive boyfriend is troubling. Like the trial court, we also find clear and convincing evidence that mother has failed to demonstrate her willingness to assume custody of the child. Although mother completed certain tasks required by the permanency plan, she has relapsed and failed to complete many important tasks. We find it particularly significant that mother failed to respond to the termination petition and did not even attend the termination hearing. Although mother initially expressed a willingness to seek treatment and attend therapy sessions, the court noted that mother "also appeared very focused on ensuring she and the father of the child could do everything together." The court later intimated that father was the supplier of mother's illegal drugs. In any event, it is telling that at the time of the termination hearing, mother had failed to utilize any of the therapeutic services offered to her. Finally, we note that mother's visitation with the child became sporadic in the months leading up to the filing of the termination petition. In the two months preceding the filing of the petition, mother did not visit the child at all. In this case, mother's actions speak much louder than her words.

## V.

### A.

Because at least one statutory ground warrants the termination of mother's parental rights, we now focus on whether termination is in the best interest of K.S. We are guided by the statutory factors set forth in Tenn. Code Ann. § 36-1-113(i):

> In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> (1) Whether the parent or guardian has made such an

- 15 -

adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interests to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

"The above list is not exhaustive[,] and there is no requirement that all of the factors must be present before a trial court can determine that termination of parental rights is in a child's best interest." *State Dep't of Children's Servs. v. B.J.N.*, 242 S.W.3d 491, 502

(Tenn. Ct. App. 2007) (citing **State Dep't of Children's Servs. v. P.M.T.**, No. E2006-00057-COA-R3-PT, 2006 WL 2644373, at *9 (Tenn. Ct. App., filed Sept. 15, 2006)).  In addition, "[t]he child's best interest must be viewed from the child's, rather than the parent's, perspective."  **In re Marr**, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005) (citing **White v. Moody**, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004)).

## B.

The trial court expressly considered the statutory best interest factors listed above. The court determined that each of the nine factors weigh in favor of a finding that termination of mother's rights is in the best interest of K.S.[4]  We agree.

Factors (1) and (2) relate to whether mother has made an adjustment in circumstance that would make it in the best interest of the child to return to her care. Mother has clearly not made such an adjustment.  Her continued abuse of illegal drugs is the most important circumstance that mother has failed to change.  It is equally clear, for the reasons stated earlier in this opinion, that DCS has made reasonable efforts to help mother address her substance abuse issues, her emotional struggles, and her unhealthy relationship with father.  Thus, factors (1) and (2) weigh in favor of a finding that termination in the best interest of the child.

Mother was allowed to visit the child once a week for one hour at a time.  The record does not indicate the total number of times mother visited the child.  The DCS case manager testified that mother had "been visiting quite a bit" but her visitation subsequently became "sporadic."  For example, mother did not visit the child at all in August 2018 or September 2018.  After DCS filed the termination petition, mother visited twice in October 2018 and once in November 2018.  Although the record is incomplete on this issue, we find it significant that mother failed to visit the child for eight consecutive weeks in the summer of 2018.  It is equally disturbing that mother only visited the child three times *after* finding out that DCS had filed a petition to terminate her parental rights.  Accordingly, we agree with the trial court that factor (3) weighs in favor of termination.

We also agree with the trial court that the child has not established a meaningful relationship with mother.  The child has been in the custody of his foster parents since birth.  He has only spent time with mother on the infrequent occasions that she decided to exercise her already limited visitation time.  Factor (4) weighs in favor of termination.

With respect to factor (5), it is undisputed that the child has successfully bonded

---

[4] Mother's brief states that the trial court did not make a finding with respect to factor (4).  On the contrary, the court's order specifically states that "[n]o meaningful relationship has otherwise been established between Respondent and the child."

with his foster parents, their extended family, and their friends from church. It is also undisputed that the foster parents are financially able to care for the child and that they intend to adopt the child. Mother's argues, however, that a change in the child's caretakers would not negatively affect the child because he is only one year old. Mother also asserts that the child's relationship with his foster family is irrelevant. Finally, mother argues that the child's foster family may experience disruption in the future because the family is currently taking care of another foster child who may return to her biological mother. We reject all of the arguments raised by mother. The child's relationship with his foster family is clearly relevant to this analysis – regardless of the child's age. Moreover, any disruption caused by the loss of a foster sibling pales in comparison to the disruption that would result from this child's return to a drug-addicted parent. This factor weighs in favor of termination.

Factors (6), (7), and (8) are interrelated as applied to the facts of this case; all three weigh in favor of termination. Mother admits that she struggles with depression and anxiety, which has fueled her drug addiction. She has admitted to using drugs during her pregnancy and during the pendency of this case. She has also admitted to living with an abusive boyfriend. Although mother claims that she will break up father, the status of their relationship and living arrangement at the time of the termination hearing was unclear.

As discussed earlier in this opinion, DCS introduced evidence that mother failed to pay any child support during the pendency of this case. By failing to attend the termination hearing, mother waived any evidentiary objections to that evidence. Accordingly, factor (9) weighs in favor of termination.

Although the factors discussed above are not an exhaustive list of the factors that may be considered in a best interest analysis, we have not identified any other facts that would indicate that preservation of the parent-child relationship is in the child's best interest.

## VI.

The judgment of the trial court is affirmed. The costs on appeal are assessed to the appellant, S.M. The case is remanded for enforcement of the trial court's judgment and collection of costs assessed below.

_____
CHARLES D. SUSANO, JR., JUDGE